In the Matter of John B. PRESCOTT and Janet L. Prescott, Debtors.

Jerry J. ARMSTRONG, Trustee, Plaintiff,

v.

MARINE BANK DANE COUNTY and Gateway Foods, Inc., Defendants.

Adv. No. 83–0283–7.

United States Bankruptcy Court, W.D. Wisconsin.

July 11, 1985.

John D. Center, Murphy & Desmond, S.C., Madison, Wis., for plaintiff.

Jerry J. Armstrong, pro se.

Patricia M. Gibeault, John C. Mitby, Brynelson, Herrick, Gehl & Bucaida, Madison, Wis., for Marine Bank Dane County.

Mark S. Schmitt, Minahan & Peterson, S.C., Milwaukee, Wis., for Gateway Foods, Inc.

ROBERT D. MARTIN, Bankruptcy Judge.

This proceeding arises on the trustee's complaint to recover alleged preferences

paid to or for the benefit of the debtor's principal financing bank and a guarantor of that financing. The trustee Jerry J. Armstrong was represented at the September 5, 1984 trial by Attorney John Center of Murphy, Stolper, Brewster & Desmond, S.C., Marine Bank was represented by Patricia Gibeault and John Mitby of Brynelson, Herrick, Gehl & Bucaida, and Gateway Foods was represented by Thomas E. Reinhart of Minahan & Peterson, S.C. Upon the evidence presented at trial, the stipulations of counsel and the entire record in the case the findings of fact and conclusions of law incorporated in the following opinion constitute the decision of this court.

John Prescott ("Prescott") was the owner of three grocery stores, including one located in Madison ("the Madison store"), which he bought from Gateway Foods ("Gateway") in 1982, while a Gateway employee. Gateway helped to finance the purchases and in return retained comprehensive security interests in all three stores, including a security interest in the Madison store's inventory.

Prescott secured additional financing for the Madison store by giving a note ("the note") in the amount of $125,000.00 to Marine Bank ("Marine") on December 15, 1982. Gateway was 50% guarantor of the note. As security for the note Marine was granted a senior security interest in the Madison store's inventory and accounts receivable the value of which remained essentially stable throughout the period relevant to this case. The note was additionally secured by all future security agreements between Prescott and Marine, and by any credit balances in Prescott's bank accounts at Marine. Prescott also signed on December 15, 1982, a commitment to deliver a $45,000.00 certificate of deposit to Marine within sixty days as additional collateral. The security agreement between Prescott and Marine provided that all the collateral secured the note and all future indebtedness of Prescott to Marine.

The note was to be paid off in monthly installments of $2,275.00, beginning January 15, 1983. Prescott made payments through March 1983, reducing the note's outstanding balance to $121,920.49.

Prescott's checking accounts at Marine were overdrawn frequently during the first quarter of 1983. Some such overdrafts were honored by Marine, apparently in the faith that the next day or two's deposits would right the balance. On March 16, 1983 the status of Prescott's accounts at Marine was:

| ACCOUNT NO. | NAME | BALANCE |
|---|---|---|
| 010–2822 | Monona Store Operating O.D. | ($49,070.04) |
| 010–2830 | Madison Store Operating O.D. | ($ 1,476.80) |
| 4669.56 | Savings | $ 1,734.00 |

On March 16, 1983, Prescott was indebted to Marine in the following amounts:

| | |
|---|---|
| note | $121,920.49 |
| overdrafts | 50,546.84 |
| TOTAL | $172,467.33 |

That indebtedness was secured by:

| | |
|---|---|
| deposit accounts | $ 1,734.00 |
| inventory and accounts receivable approximately | 130,000.00 |
| TOTAL | $131,734.00 |

On that day Prescott was indebted to Gateway in the total amount of approximately $1,247,617.70. The indebtedness to Gateway was secured by:

| | |
|---|---|
| junior security interest in Madison Store inventory and account receivables | $ –0– |
| other security conceded to be less than $600.00 | $600,000.00 |
| TOTAL | $600,000.00 |

At the request of Marine, on March 17 Prescott delivered his $35,000.00 certificate of deposit (the "C/D") to Marine ostensibly in fulfillment of his prior commitment to provide a certificate as an additional item of collateral. On March 31, 1983, after numerous checks from Prescott to Gateway were returned N.S.F. and after determining that its security in Prescott's stores had decreased, Gateway took over operations of Prescott's three stores. On April 4, 1983, after learning of Gateway's takeover, Marine declared itself insecure on the note and applied all of Prescott's bank accounts, each of which had a positive balance and all totalling $18,353.59, to the payment of the note. On June 3, seventy-eight days after having taken possession of

it, Marine cashed the C/D for $34,290.12 and applied the proceeds to the note, reducing the outstanding note balance to $69,-276.78.

On July 18, 1983, Gateway paid Marine $76,872.81 on the note. In return Marine assigned its security interests in the Madison store to Gateway.

Prescott filed for bankruptcy under chapter 7 on June 14, 1983. The trustee appointed in that case now seeks to recover from Marine and Gateway the value of the C/D and any deposits to the various bank accounts which were credited to Prescott's indebtedness after March 16, 1983. The trustee claims that the delivery of the C/D and the crediting of the positive balances on account constitute preferential transfers voidable pursuant to 11 U.S.C. § 547(b). Section 547(b) provides:

> Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made on or within ninety days before the filing of the petition; ... and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>
> (A) the case were a case under chapter 7 of this title;
>
> (B) the transfer had not been made; and
>
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Section 547(g) gives the trustee the burden of proving the first, second, fourth and fifth elements of a preference by a preponderance of the evidence, *see In Re Hogg*, 35 B.R. 292 (Bankr.D.S.D.1983); *In Re Music House, Inc.*, 11 B.R. 139, 7 B.C.D. 882 (Bankr.D.Vt.1980). However, the trustee benefits from a presumption under 11 U.S.C. § 547(f) as to the third element. In the present case there is no dispute as to the first four numbered requirements for a preference and each is deemed to have been proved. However, both Marine and Gateway contend that what was transferred to Marine was subject to a perfected security interest of Marine and for that and other reasons did not cause the defendants in this proceeding to receive more than other creditors of the same class.

■ A three step analysis is involved in calculating section 547(b)(5). First to be determined is the class to which a creditor belongs; second, how much the creditor did receive; and third, how much the creditor would have received had the transfer not occurred and the case had been administered under chapter 7.[1] Generally, holders of secured claims must each be considered as a separate class. Thus, to the extent that a creditor possesses an allowable se-

---

1. "Section 547(b)(5) ... requires a comparison between what the creditor actually received and what other creditors would of the same class receive in a chapter 7 liquidation. The trustee must prove that the effect of the transfer is to enable the creditor to obtain a greater percentage of its debt than it would receive under the distributive provisions of the Code." 4. *Collier on Bankruptcy* ¶ 547.35, 547–119 (15th ed. 1985). The majority of courts have stated that under this analysis payments to fully secured creditors are not preferences because the creditors would receive 100% of their claims under chapter 7. *See, e.g., In Re Santoro Excavating, Inc.*, 32 B.R. 947, 10 B.C.D. 1369 (Bankr.S.D.N.Y.1983); *In Re Hale*, 15 B.R. 565, 8 B.C.D. 434 (Bankr.S.D. Ohio 1981); D. Epstein, *Trustee's Avoiding Powers*, 2 BANKRUPTCY PRACTICE AND PROCEDURE 28–29 (PLI 1984) ("Section 547(b)(5) ... will be satisfied unless (1) the creditor was fully secured before the transfer, (2) the transfer is merely seizure of collateral, or, (3) the property of the estate is sufficiently large to permit 100% payment to all general claims."). At least one court, however, has noted that in some cases transfers to secured creditors are preferences. "[T]here are circumstances where such a payment [to a secured creditor] may deplete a debtor's estate, e.g. where the value of the collateral does not exceed the amount of the debt and the periodic decrease in this value does not exceed the amount of the payment made. Therefore, the more correct formulation would be that payment of a secured claim is not a preference if such payment is accompanied by the release of an equivalent value to the estate." *In Re Zuni*, 6 B.R. 449, 452, 6 B.C.D. 1222 (Bankr.D.N.M.1980) (citation omitted).

cured claim at the beginning of the preference period, ninety days before the commencement of this bankruptcy case,[2] it cannot be the recipient of a preference. A payment on such a secured claim, in addition to reducing the indebtedness, would presumably release the collateral to the other creditors. To the extent that the same creditor's claim is unsecured, however, the claim must be considered in the class of general creditors, subject to rules of priority where applicable, and entitled to distribution only pro rata with other general claims.

■ To determine whether a creditor is fully secured the court looks at the creditor's status immediately before the contested transfers occurred. Epstein, *supra* at 28. In the instant case, the first of the contested transactions, Marine's perfection of its security interest in Prescott's Certificate of Deposit, occurred on March 17. The measuring date of Marine's status would be before that transfer, on March 16, which is coincidentally the first day of the preference period.

Marine's position on March 16, 1983, the day prior to the transfer of the C/D was that of a holder of both a secured claim in the amount of $131,734.00 and an unsecured general claim in the amount of $40,-733.33. Immediately prior to crediting the bank accounts against the note on April 4, 1983, Marine was fully secured by virtue of additional deposits which had erased the overdraft debt. Those deposits were transfers which increased the portion of Marine's claim which was secured during the

preference period and thus must themselves be considered as preferences. Gateway had no security or other interest in deposits to the bank accounts or the C/D except by the subsequent transfer of Marine's security position to Gateway on July 18, 1983.

On March 16, 1983, Marine had an unsecured claim against Prescott in the amount of $40,733.33. Because there is no contention by anyone that unsecured claims will be paid in full in this case it is necessary to conclude that had the claim remained unsecured Marine would have received less than $40,733.33 from the liquidation of the debtor.

However, Marine received the C/D on March 17, 1983, which permitted it to obtain $34,290.12 on June 3, 1983. After receiving the C/D, Marine received additional transfers in the form of deposits to Prescott's accounts which both reduced Prescott's indebtedness to Marine on the overdrafts and, once positive balances were achieved in any account, provided collateral for the note. Those deposits made to accounts in which negative balances existed were, like the transfer of the C/D, obviously payments made on antecedent debts. To the extent that deposits to accounts with positive balances constituted new collateral for the note, they too were transfers applied against antecedent debt.[3]

■ The transfer of the C/D perfected a previously unperfected security interest in favor of Marine[4] and represented a voida-

---

**2.** The preference period is calculated by counting back ninety days from the date the bankruptcy case was filed. *In Re Schneider,* 44 B.R. 961 (Bankr.W.D.Wis.1984); *In Re Gander Mountain, Inc.,* 29 B.R. 260 (Bankr.E.D.Wis.1983). In this case, filed on June 14, 1983, the preference period began on March 16, 1983.

**3.** 11 U.S.C. § 101(48) explains, " 'transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption...." *See In Re R & T Roofing Structures,* 42 B.R. 908, 11 C.B.C.2d 397 (Bankr.D.Nev.1984) (transfer occurred when a

secured creditor, in satisfaction of its tax lien perfected outside the 90-day period, levied on and seized debtor's cash within 90-day period); *In Re Hughes,* 704 F.2d 820, 10 B.C.D. 693 (5th Cir.1983) (creditor's repossession and sale of debtor's collateral constitutes a preferential transfer).

**4.** WIS.STAT. § 409.305 provides:

A security interest in letters of credit and advices of credit ... goods, instruments, money, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral.... A security interest is perfected by possession from the time possession is taken without relation back

ble preferential transfer by fulfilling all of the requirements of section 547(b). Similarly the deposits which increased the net balances in the accounts to a sum sufficient, either by reduction of indebtedness or increase in collateral, to fully secure all debts to Marine, permitted Marine to receive a voidable preference. However, to the extent that the deposits exceeded the sum sufficient to fully secure Marine, their character as a voidable preference must be considered solely in the context of the trustee's claim against Gateway.

Through the combination of transfers Marine has been preferred at least to the extent of $40,733.33.[5] Because those transfers are voidable by the trustee, Marine is liable to the trustee in their full amount.

Marine's seizure of Prescott's bank accounts presents an additional question. The analysis thus far has assumed that Marine was exercising its right under WIS. STAT. § 409.503: "[u]nless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process...." Prescott was in default on April 4 and Marine had the right under this statute and its loan agreements to take possession of Prescott's bank accounts which were collateral for the note. However, the trustee urges the view that Marine was setting-off Prescott's accounts. The note provided that in the event of default Marine could set-off Prescott's accounts against the note. It is unclear whether that provision refers only to Marine's rights under WIS. STAT. § 409.503, or also to Marine's common law right to set-off. I am satisfied from the testimony presented in this case

that Marine believed and intended that the accounts were seized under the terms of its U.C.C. security interest in those accounts. Thus, while a study of the differences between a creditor's position under section 547(b) and 11 U.S.C. § 553(b) might be an instructive exercise it is not necessary in this case. I am further satisfied that because the insufficiency ninety days prior to the date of bankruptcy filing was entirely extinguished on the date setoff was exercised the result would be essentially the same.

■ Finally, it must be determined whether the contested transactions constitute avoidable indirect preferences to Gateway under section 547(b). The trustee contends that Gateway received indirect preferences under section 547(b) because of the contested transactions between Prescott and Marine. "As the phrase 'to or for the benefit' implies, preference law is sufficiently broad to encompass both direct and indirect transfers to a creditor." 2 NORTON BANKRUPTCY LAW AND PRACTICE, Part 32-Page 26 (1981). The transfers were made for the benefit of a creditor (Marine) on account of an antecedent debt (owed to Marine), while the debtor (Prescott) was insolvent and within ninety days before the date of filing. The transfers also satisfied requirement of § 547(b)(5) in that they enabled Gateway to receive more than it would have had the transfers not occurred.

Gateway benefited from the transfers in two ways. First, when Marine seized Prescott's accounts, Marine's debt had been reduced from $172,467.33 to approximately $123,000.00 by the deposits to the accounts between March 16, and April 4, 1982. Thus, the application of the $18,353.59 in

and continues only so long as possession is retained, unless otherwise specified in this chapter. The security interest may be otherwise perfected as provided in this chapter before or after the period of possession by the secured party.
Courts regularly hold that perfection of a security interest constitutes a transfer for section 547 purposes. *See, e.g., In Re Caudy Custom Builders, Inc.,* 31 B.R. 6 (Bankr.D.S.C.1983) (recording a mortgage on real property is a transfer avoidable as a preference); *In Re Enlow,* 20

B.R. 480 (Bankr.S.D.Ind.1982) (filing of a financing statement to perfect a security interest constitutes a transfer).

5. To the extent that the sale of its position to Gateway on July 18, 1983, paid Marine interest for the period following March 16, 1983, which would not have been a part of its secured claim Marine was further preferred. However, the evidence is insufficient to permit more than a very rough estimate of that interest.

the seized accounts further reduced the debt secured by Marine's interest in the $130,000.00 store inventory to approximately $104,646.41 and Gateway's junior interest in the inventory increased in value from $-0- to $25,353.59, the amount by which Marine's security exceeded its claim. Similarly when Marine took possession of the C/D, Marine's interest in the inventory was reduced by an additional $34,290.12. Because Gateway's interest was junior to Marine's, as Marine's debt secured by the Madison store's inventory decreased, Gateway's interest in the security increased dollar for dollar, or to the extent of $59,643.71 from the transfers. That increase in Gateway's secured position reduced, or paid off, a like amount of its allowable unsecured claim against Prescott.

Second, Gateway was a 50% guarantor of the note. Because of the contested transactions, Gateway's liability on the guaranty decreased by $20,366.66, or one-half of Marine's unsecured claim which was paid by the preferential transfer.

The transfers thus benefited Gateway both increasing its collateral and reducing its indebtedness on the guaranty. Absent the contested transactions Gateway would have received less upon Prescott's liquidation in chapter 7. Gateway was not a fully secured creditor at the date of Prescott's filing. Schedule A–2 of Creditors Holding Secured Interests shows that Gateway held three claims amounting to $821,146.73, and was secured in various of Prescott's assets in all three stores. It has been conceded that Gateway was owed over $1,000,000.00 on the date of filing and that the maximum value of Gateway's collateral was less than $600,000.00.

■ Although Gateway benefited from the transfers in two ways, it is liable only for the amount transferred which reduced the fund to which other creditors with unsecured claims resort for payment. *See* 4 *Collier on Bankruptcy, supra,* at 547–89. The transfers between Marine and Prescott caused Gateway to be benefited doubly, once in the amount of $59,643.71 and once in the amount of $29,366.66, but Prescott's estate was only depleted by $59,-643.71. Therefore, the indirect transfers to Gateway in the amount of $59,643.71 are the only ones which can be avoided under section 547.

There is no evidence that in purchasing Marine's position on July 18, 1983, Gateway acquired anything more than the junior position which it had previously held, except to the extent of the benefits received by the transfers herein avoided as preferential transfers. For that reason analysis of the effect of that transaction need not be further pursued.

Therefore, it is

ORDERED that judgment on the trustee Jerry J. Armstrong's complaint to avoid transfers under 11 U.S.C. § 547(b) may be entered in the amount of $59,643.71.

IT IS FURTHER ORDERED that Marine Bank and Gateway Foods are jointly liable to trustee Jerry J. Armstrong for the recovery of $40,733.33, and Gateway Foods is individually liable to trustee Jerry J. Armstrong for the remainder, in the amount of $18,910.38.