Albert F. DURHAM, Trustee in Bankruptcy for Continental Commodities, Inc., Plaintiff–Appellee,

v.

SMI INDUSTRIES, INC., d/b/a Kasle Recycling, Inc. and d/b/a Schuchman Metals, Inc. and SMI Industries Corporation, d/b/a Kasle Recycling, Inc. and d/b/a Schuchman Metals, Inc., Defendants–Appellants.

No. C–C–87–0454–P.

United States District Court, W.D. North Carolina, Charlotte Division.

Sept. 6, 1988.

---

Albert F. Durham, Charlotte, N.C., for plaintiff-appellee.

Joseph W. Murphy, Indianapolis, Ind., Edward P. Hausle, Charlotte, N.C., for defendants-appellants.

## ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on Defendants' appeal from the decision of the bankruptcy court. The trustee brought this adversary action to recover an alleged preferential transfer made by the debtor to Defendants. Defendants contended that the transfer actually was a set-off, permissible under section 547(b) of the Bankruptcy Code because it did not enable Defendants to receive more than they would have received if this case were a Chapter 7 case. The bankruptcy court ruled for the Trustee, allowing recovery of the preferential transfer. For the reasons stated herein, this Court will affirm that ruling.

## I. FACTS

The bankruptcy court's findings of fact were undisputed in all essential aspects. They read:

### FINDINGS OF FACT

1. The Plaintiff, Albert F. Durham (hereinafter "Trustee"), is the Trustee in Bankruptcy for Continental Commodities, Inc. (hereinafter "Debtor") in a Chapter 7 proceeding under Title 11, United States Code, pending in the United States Bankruptcy Court for the Western District of North Carolina, and was appointed as Trustee on December 9, 1983.

2. The Defendants are corporations incorporated under the laws of the State of Indiana, having their principal place of business in Indianapolis, Indiana.

3. That on November 18, 1983, a voluntary Petition was filed with this Court under Chapter 7 of Title 11, United States Code, by Continental Commodities, Inc., the Debtor herein, and on that date, an Order for Relief was entered.

4. That from September 3, 1982 through June 28, 1983, the Debtor contracted to purchase from the Defendants certain scrap metal goods. These metals were purchased through various transactions which were evidenced by numerous documents. The parties have stipulated that the attached table marked Exhibit "A" and incorporated herein by reference, truly and accurately represents the data relevant to this lawsuit arising from those transactions being based upon the relevant documentation as reviewed by the parties.

5. All shipments set forth in said table were received and accepted at their respective destinations within three days of the shipment date as set forth in the table.

6. Each check in the attached Exhibit "A" table represents payment of the invoice to which it relates by that table, and the debt which the invoice represents.

7. Each check as shown on the attached Exhibit "A" represents payment by the Debtor to the Defendants for the invoices related to said check by the table.

8. Each check on the attached Exhibit "A" was dated August 25 or 26, 1983, was paid to the Defendants, was deposited by the Defendant in its bank, and was honored by the Debtor's bank on 9/1/83 or 9/2/83.

9. The Debtor was insolvent on and at all times during the ninety days immediately preceding the date of the filing of the petition.

10. That in addition to the transfers set froth [sic] above, during the period of February 22, 1983 through August, 1983, the Defendants in separate transactions contracted to purchase from the Debtor certain scrap metal goods, and on account of the same on August 29, 1983 issued to the Debtor a check in the amount of $271,967.20 on account of the Debtor's outstanding invoices. Said check was received by Southern National Bank pursuant to a factoring arrangement with the Debtor, deposited in Southern National Bank's blocked account and credited against the Debtor's outstanding loan balance under an accounts receivable factoring arrangement that the Debtor kept with Southern National Bank.

The parties prior to trial stipulated to each of the above Findings of Fact nos. 1–10. In addition to these stipulations, and based upon the evidence presented at trial, the Court makes the following additional Findings of Fact:

11. Jerry Gilbert, the Debtor's former bookkeeper, testified that Continental Commodities, Inc. and SMI, in their business dealings often incurred debts owed by one to the other and relating to purchases of scrap metal. Payments of these debts were often coordinated by the two business entities. Payments were handled in three ways:

(1) By independent payments by one of the two companies of the other's outstanding debts;

(2) By a so-called "check swap" whereby each company wrote the other one or a series of checks which, while coordinated with respect to time of issuance and delivery by the parties, were nevertheless deposited in the recipient's bank, and paid by the payor's bank; and

(3) By so-called "contras" where the parties agreed to the amounts owed one another under each of their respective outstanding invoices and then offset these against one another by accounting entries on their respective books.

The transfers in issue here involved checks that were delivered, deposited and paid.

12. As noted above, the Debtor maintained an accounts receivable factoring arrangement with Southern National Bank. As testified to by Jerry Gilbert, Continental Commodities prior to the filing of the bankruptcy Petition, submitted to Southern National Bank a weekly Account Receivable Aging Report. Southern National Bank then extended credit to the Debtor based on the Debtor's eligible outstanding accounts receivable (80% to 85% eligibility). The Debtor wrote the seventeen checks that are in contest today from the funds made available to the

Debtor by Southern National Bank. When collections were received on the Debtor's outstanding accounts receivable, such as the SMI August 29, 1983 check, the same were deposited directly to a Southern National Bank by a lock box account. These collections were applied to the Debtor's outstanding factoring loan balance with Southern National Bank, thereby indirectly increasing the Debtor's borrowing eligibility. These collections were not deposited in the Debtor's banking account but rather to an account of Southern National Bank and did not become funds of the Debtor. Thus, it cannot be said that the monies transferred by way of the Debtor's seventeen checks to SMI were the same monies that SMI paid the Debtor. The manner in which the transfers were handled were a benefit to the Debtor in that it increased the Debtor's borrowing eligibility pursuant to their factoring arrangement with Southern National Bank. 13. The Trustee testified as to his familiarity with the books and records of Continental Commodities, the claims on file against the estae [sic] and the prospective distribution of this estate to general unsecured creditors. The Trustee's testimony indicated that at the present time the estate possesses in excess of $400,-000.00. The Trustee further testified that there are outstanding priority claims and administrative expense claims of approximately $100,000.00 and unsecured claims against the Debtor of over $1,000,000.00. It was the Trustee's opinion that the estate could potentially deliver at least a twenty-five (25%) percent payout to general unsecured creditors, but in no case could the distribution reach one hundred (100%) percent.

Based on these facts, the bankruptcy court concluded that the checks from the debtor to Defendants constituted transfers within the meaning of 11 U.S.C. § 101(41), and that Defendants were benefitted thereby; that the debtor made the transfer as payment of an antecedent debt; that the debtor was insolvent on and after 90 days prior to the filing of the bankruptcy petition, which includes the time period in which the transfers were made; that the transfers allowed Defendants to receive more than they would have received had the transfers not been made and had the debtor gone through a Chapter 7 proceeding; that the transfers did not come under the contemporaneous exchange 'for new value or subsequent exchange for new value exceptions; that these transfers were not setoffs under 11 U.S.C. § 553; and that even if they could be considered setoffs, section 502(d) precludes Defendants from asserting a claim in the bankruptcy proceeding.

Defendants, apparently rejecting the maxim that "less is more," asserted 15 separate errors on appeal, requiring this Court to wade through a great deal of chaff to find what little wheat existed. As an example of chaff, Defendants' "Twelfth Issue" reads: "Did the Bankruptcy Judge err in determining as a matter of law '[t]he foregoing findings of fact, to the extent that they constitute conclusions of law, are herein incorporated by reference and denominated conclusions of law. To the extent that these conclusions of law constituted findings of fact, they are incorporated by reference therein and denominated findings of fact'? The standard of appellate review on this issue is *de novo*." This could be the most frivolous issue this Court has seen in over six years on the bench. The Court will address herein those issues which are worthy of notice.

## II. ELEMENTS OF PRIMA FACIE CASE OF § 547(b) PREFERENTIAL TRANSFER

Section 547(b) of the Bankruptcy Code sets out the prerequisites for the trustee's recovery of a preferential transfer:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Appellant asserts in Issues One, Two, and Three that the trustee failed to show that all of these elements were present in the subject transaction. Specifically, Appellant contends that the payment from the debtor to Appellant was not a "transfer" as contemplated by this code section, and that the payment did not allow Appellant to receive more than it would have received if the payment had not been made and the estate had been liquidated.

Appellant's contention that the check payments were not "transfers" within the meaning of the Code need not detain the Court. As defined in 11 U.S.C. § 101(41) (1982), " 'transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property of with an interest in property, including retention of title as a security interest." Obviously, payment by check fits squarely within this broad definition. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 27 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5813.

The nub of this case, and the only real issue on appeal, lies in the bankruptcy court's findings, and the conclusions based thereon, with respect to § 547(b)(5). Appellant argues that it did not receive, as a result of the allegedly preferential transfer, any more than it would have received had the transfer not occurred and the estate been liquidated.

The bankruptcy court found that had the estate been liquidated, unsecured creditors would have been entitled to about 25¢ on the dollar. This finding is not challenged on appeal. Appellant argues, however, that it was a completely *secured* creditor and therefore would have received 100% of its claim against the estate. Appellant claims secured status from its right to offset the debtor's debt to it against the amount it would have owed the debtor. Appellant claims that, had the debtor not made the allegedly preferential transfer, then either Appellant would not have sent the corresponding check payments to the debtor, or the bank would have dishonored such check payments as were sent for insufficient funds. In either case, Appellant still would owe the debtor an amount equal to that owed Appellant by the debtor. Appellant would be entitled to offset its debt against that of the debtor, effectively recovering thereby 100% of its claim.

The court below held that § 547(b) required it to address only the situation which would face it if the debtor had not made the transfer, disregarding any consequences occurring as a result of the debtor's failure to pay. The court therefore addressed the hypothetical scenario wherein, upon filing the petition, the debtor still owed Appellant $273,137.62, but, because Appellant had paid its debt to the debtor before the petition was filed, Appellant owed the debtor nothing. The bankruptcy court concluded, on its hypothetical facts, that Appellant would have an unsecured claim against the estate, because Appellant would not have any debt to the estate which could be offset against Appellant's claim. Appellant thus would receive what the other unsecured creditors received: 25% of Appellant's claim.

The question, then, is whether the court below erred in refusing to consider the effect that the debtor's hypothetical nonpayment would have had on the sequence of events prior to the filing of the petition.

'The wisdom in the bankruptcy court's refusal to engage in a "what if" game, beyond that authorized by the statute, is apparent. It is clear that a court should not consider the consequences of eliminating the preferential transfer where those consequences are shown only by the transferee's statement that "if the debtor had not paid what it owed me, I would not have paid my debt to the debtor." Allowing such evidence invites speculation, and is tantamount to allowing creditors to claim secured status because "if I had known he'd go bankrupt, I would not have extended credit." It asks the court to inquire too deeply into the creditor's state of mind, a fact which usually may be proven only by testimony of the creditor itself, which has the considerable benefit of hindsight when called upon to say what it would have done *if.* Few willingly would pay an incipient bankrupt when possessed of knowledge that the bankrupt would not pay its corresponding debt.

Here, however, there was evidence that, had the debtor not made the questioned transfer, Appellant's checks to the debtor would have bounced. The sorry state of its bank account was something over which Appellant had little control. The absence of sufficient funds arguably is a *fact,* not speculation, and so some of the concerns expressed above are eliminated. Nonetheless, this Court finds the lower court's approach sound, and Appellants' reading of the statute unsupported by case law.

Appellant urges that *Lingley v. Contractors Group, Inc. (In re Nepsco, Inc.),* 55 B.R. 574 (Bankr.D.Me.1985), *Braniff Airways, Inc. v. Exxon Co.,* 814 F.2d 1030 (5th Cir.1987), and *Mason and Dixon Lines, Inc. v. St. Johnsbury Trucking Co. (In re Mason and Dixon Lines, Inc.),* 65 B.R. 973 (Bankr.M.D.N.C.1986) support its view that the Court must consider the consequences of eliminating the debtor's allegedly preferential transfer. Appellant claims that, in these cases, "[e]ach court concluded the creditor's payment was made as a result of the debtor's payment, and if the debtor's payment was not made the creditor would not have paid." Defendant–Appellant's Reply Brief 10 (Nov. 17, 1987).

An examination of these cases reveals that an element common to all of them is missing in the case before the Court. In *Lindley, Braniff Airways,* and *Mason and Dixon Lines,* the creditor owed the debtor a debt *at the time the bankruptcy case was commenced.* This debt, existing at the commencement of bankruptcy, could be offset against the amounts received by the creditor and returnable as a preference. Here, SMI owed Continental nothing at the time of the bankruptcy, so there is nothing to offset against the preferential transfer.

That the creditor must owe the debtor something at the filing of the petition is evidenced a quotation from *In re Nickerson & Nickerson,* 62 B.R. 83, 85 (Bankr.D. Neb.1986):

[T]o maintain a right of setoff, the creditor must prove the following:

1. A debt *exists* from the creditor to the debtor and that debt arose prior to the commencement of the bankruptcy case.

2. The creditor has a claim against the debtor which arose prior to the commencement of the bankruptcy case.

3. The debt and the claim are mutual obligations.

(Emph. added).

In this case, the creditor (SMI) owed nothing to the debtor when the petition was filed, for it had paid the debtor when the simultaneous check transfer took place. Thus, SMI did not satisfy the first element listed in *Nickerson.*

### III. NEW VALUE

Appellants' ninth and tenth issues address the "new value" exceptions to the trustee's ability to recover a preference. These defenses are found in 11 U.S.C. § 547(c)(1) & (4):

The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was

(A) intended by the debtor and the creditor to or for whose benefit such

transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

.    .    .    .    .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor; ....

Appellants urge that the "new value" required by these subsections consists in Appellants' forfeiting their right of setoff when they received the debtor's check. This Court agrees with the bankruptcy court that Appellants advanced no "new value" in exchange for the debtor's checks—the checks purely and simply were in payment of an antecedent debt. Appellants' attempt to create something else from a straightforward transaction is specious.

## IV. NORTH CAROLINA LAW AND THE BANKRUPTCY CODE ON SETOFF

■ Appellants' fifth and sixth issues on appeal challenge the bankruptcy court's determination that the check exchange was not a setoff under either North Carolina law or under 11 U.S.C. § 553. It is unnecessary for the Court to reach these issues, however, for the bankruptcy court also held that, even if the check exchange did constitute a setoff under North Carolina law and section 553, Appellants still could not prevail because (1) section 502(d) of the Bankruptcy Code precludes any otherwise allowable claims by any entity which has received a preference, a fraudulent conveyance, or which holds estate property; since there is another preference action against Appellants regarding this estate, section 502(d) would preclude their recovery of a claim against this estate and therefore would preclude the use of the setoff provi-

sions; and (2) setoff under the Code is discretionary and the bankruptcy court refused to exercise its discretion to allow setoff in this case. Appellants did not appeal these alternative holdings. Accordingly, the Court will not address issues five and six.

## V. SEPARATION OF LEGAL ENTITIES

■ Appellants complain of the bankruptcy court's failure to render separate findings of fact as to each of them. The record reveals that Appellants themselves failed to make any distinction between the allegedly separate entities until after the trial. The only testimony concerning the entities that SMI Industries, Inc. was the parent corporation of Schuchman Metals, Inc. SMI Industries, Inc. and Schuchman Metals, Inc. merged in 1984, and SMI Industries Corp. was created as the operating company of the two merged companies. The evidence was sufficient to allow the bankruptcy court to treat the three as one, particularly in view of the fact that Appellants themselves did so.

NOW, THEREFORE, IT IS ORDERED that the ruling of the bankruptcy court is AFFIRMED.