136 B.R. 727 (1992)
In re N. Eddie MONTGOMERY and Southland Escrow Services, Inc., Consolidated Debtors.
John C. McLEMORE, Plaintiff-Appellee,
v.
THIRD NATIONAL BANK IN NASHVILLE, Defendant-Appellant.
No. 3:91-0173.
United States District Court, M.D. Tennessee, Nashville Division.
February 13, 1992.
*728 Bradley Alan MacLean, Katherine Martin Allen, Farris, Warfield & Kanaday, Nashville, Tenn., for Third Nat. Bank.
Robert Martin Garfinkle, Edwin M. Walker, McMackin, Garfinkle, McLemore & Walker, Nashville, Tenn., for John C. McLemore, Trustee.

MEMORANDUM
WISEMAN, District Judge.
This bankruptcy appeal raises the issue of whether a Bankruptcy Court properly held that a trustee in bankruptcy may recover preferential transfers from a bank that extracted itself from the debtor's illegal check kiting scheme. The Bankruptcy Court for the Middle District of Tennessee held on February 8, 1991 that the debtor's checking transactions resulted in avoidable preferences and ordered the trustee to recover $2,254,935 plus pre-judgment interest from January 30, 1989. In re Montgomery, 123 B.R. 801 (Bankr. M.D.Tenn.).
For the following reasons, this Court AFFIRMS the judgment and order of the Bankruptcy Court.

BACKGROUND
In July 1987, N. Eddie Montgomery, a Nashville lawyer whose company, Southland Escrow Services, Inc. (Southland), conducted thousands of real estate closings in Middle Tennessee, initiated a business relationship with the Third National Bank in Nashville (TNB). Montgomery complained to TNB officers that he was having cash flow problems with his accounts at another bank. In response, TNB designed a "cash management system" for Montgomery, consisting of three new TNB accounts, a lock box, and an "Interlink" computer terminal. The system was intended to reverse Montgomery's cash flow problems, and earn him an estimated $42,246 in annual interest.
The cash management system became operational in August 1987. As designed, Montgomery would have runners deliver checks to the lock box at TNB's operations center throughout the day; these deposits would be immediately credited to Montgomery's Main Funding Account (MFA). Once a day, funds needed to cover disbursements would be transferred from the MFA to the other two accounts, a Zero Balance Account (ZBA) at Third National, and a Controlled Disbursement Account (CDA) at a TNB affiliate in Oak Ridge, Tennessee. Montgomery could write checks on both these accounts. TNB recommended that Montgomery use the ZBA for "local checks", because checks would clear that account throughout the day. Using the CDA whenever possible would gain Montgomery "days of float" because the distant bank cleared checks only once each morning. Montgomery could manage all these accounts with the Interlink terminal.
From the start the system failed to work as intended; deposits usually were made to *729 TNB branches throughout the Nashville area, rather than to the lock box, the CDA remained largely unused, and the ZBA was not "zeroed out" at the close of each day. Checks against the ZBA were carried as an overdraft until the next day, and then the MFA would be debited to cover the ZBA overdraft, regardless of whether the MFA contained sufficient funds to do so. On succeeding days, incoming checks would be applied against overdrafts in the MFA. In short, although many checks were coming and going, Montgomery's accounts were constantly "one day in arrears".
Montgomery earned no interest from his accounts. By September 1987, his $500,000 line of credit was exhausted, and TNB began assessing Montgomery "analysis charges" each month based on the "average [negative] collected balances" in the MFA and ZBA.
In January and February 1988, TNB officers met with Montgomery to discuss the cash management system and the analysis charges. Montgomery agreed to "take action" to reduce the negative balances. By then, TNB officers were discussing how to move Montgomery out of the bank, especially in light of the January analysis charge for $30,850  the largest they had ever seen.
On February 10, 1988, Montgomery presented TNB with a written proposal to reduce his negative balances by changing the conduct of his real estate closings, by transferring funds from Sovran Bank (currently NationsBank) to TNB, and establishing a line of credit at Sovran Bank. Montgomery also agreed to make monthly deposits of $5000 at TNB, to be pledged against the Sovran credit line.
In April 1988, TNB "deleted" Montgomery's cash management services. On April 11, 1988, Montgomery met with TNB officers to discuss the mechanics of stopping the system. Between April 18th and April 21st, disbursements from the ZBA abruptly stopped. When two deposits to the MFA bounced, they were replaced by $320,000 in cashiers' checks drawn on Sovran. No deposits were made to the MFA after May 3, 1988. On May 9, 1988 funds from the MFA were used to pay approximately $240,000 on Montgomery's line of credit at TNB. By mid May, Montgomery's balances at TNB were reduced to insignificance, and his TNB credit line was converted to a term loan.
Involuntary Chapter 7 petitions were filed against Montgomery and Southland on June 3, 1988.
A C.P.A. hired by John C. McLemore, Montgomery's trustee in bankruptcy, later determined from his analysis of more than 60,000 checking transactions and 6,000 real estate closings that Montgomery/Southland's activities were part of a "colossal check kiting scheme" involving TNB, Sovran, Metropolitan Federal Savings and Loan Association, and Investor's Federal Savings Bank.
On January 30, 1989, the trustee demanded that TNB return approximately $2 million in preferential transfers under 11 U.S.C. § 547. The matter was tried before Bankruptcy Judge Keith M. Lundin in the Middle District of Tennessee, and the Bankruptcy Court found that TNB received an avoidable preference when it extracted itself from the debtor's check kiting scheme within 90 days of Montgomery's involuntary bankruptcy. The Bankruptcy Court ordered the trustee to recover from TNB $2,254,935 plus prejudgment interest from the date of trustee's demand. The amount of the judgment consisted of the greatest extent of the kite residing at TNB during the preference period ($2,012,418 on March 21, 1988), plus $242,517 in payments that were made against Montgomery's line of credit at TNB in May 1988, after the kite had shifted away from TNB.

STANDARDS OF REVIEW
On appeal, a Bankruptcy Court's findings of fact may only be reversed if they are "clearly erroneous". Bankruptcy Rule 8013, In re Finn, 909 F.2d 903, 905 (6th Cir.1990). Conclusions of law are fully reviewable on appeal. In re New England Fish Co., 749 F.2d 1277, 1280 (9th Cir. 1984), In re Gribben, 84 B.R. 494, 495 (S.D.Ohio 1988). An award of prejudgment interest is within the discretion of the *730 Bankruptcy Court; a finding of abuse of discretion requires "a definite conviction that the court, upon weighing relevant factors, clearly erred in its judgment." In re Universal Clearing House, 60 B.R. 985, 1001 (D.Utah 1986), Gordon v. United States Steel Corp., 724 F.2d 106, 108 (10th Cir.1983).

ISSUES PRESENTED
TNB raises the following issues on appeal:
1) Did the Bankruptcy Court fail to properly identify the existence of a "transfer" or "transfers" as required by 11 U.S.C. § 547(b)?
2) Did the Bankruptcy Court err by failing to find that any such transfer involved a property interest of the debtor?
3) Did the kiting transactions result in a depletion of the debtor's estate?
4) Was the award of pre-judgment interest proper?
The trustee claims that as a "new" issue brought on appeal, the existence-of-a-transfer question is not properly before this court. The trustee alleges that the bank failed to raise the issue at any proceeding before the Bankruptcy Court, and has in fact conceded the existence of transfers in various documents filed with the Bankruptcy Court.
According to the trustee, Rule 16(e) of the Federal Rules of Civil Procedure, applicable in bankruptcy cases through Bankruptcy Rule 7016, mandates that the court's pretrial order "shall control the subsequent course of the action." The trustee charges that TNB never sought to raise the existence of transfers issue at conference prior to the issuance of that order, or at any pretrial, trial, or post-trial proceeding. According to the trustee, the appellant did not raise the issue because TNB admitted the existence of transfers in various documents submitted to the Bankruptcy Court. To support this claim, the trustee refers to numerous passages in these documents where TNB used the word "transfer" or "transfers".[1] The trustee argues that the Bankruptcy Court had no reason to specifically address that issue in its opinion because TNB repeatedly had admitted the existence of transfers.
TNB admits that "the issues in this appeal are being presented for the first time." Appellant's Reply Brief at 4. However, TNB claims that the Bankruptcy Court, by holding that the check kite itself was an antecedent debt under 11 U.S.C. § 547(b)(2), decided the case on a theory different from either litigant's trial presentation, and has itself raised the issue, entitling TNB to appellate review of the court's reasoning.
TNB denies that it has admitted the existence of transfers by using that word in its briefs, and charges that the trustee "would have this Court take the words of Third National ... out of context." Appellant's Reply Brief at 4. TNB argues that it only used this language to respond to the trustee's version of the case, and while they never disputed that various deposits were made to accounts at their bank, they never admitted that these deposits resulted in potentially avoidable transfers.
This Court has held previously that it is proper for a District Court to review new issues in a bankruptcy appeal when such review would require no new findings of fact, In re H & S Transportation, Inc., 110 B.R. 827 (M.D.Tenn.1990), the same standard that has been adopted by Circuit Courts for non-bankruptcy appellate review. See e.g., Higganbotham v. Ford Motor Corp., 540 F.2d 762, 768 n. 10 (5th Cir.1976), reh'g den., 561 F.2d 831 (5th Cir.1977), U.S. v. Jones, 527 F.2d 817 (D.C.Cir.1975).
This Court interprets the record in this case as showing that the "existence of a transfer" issue was brought before the Bankruptcy Court, but without adopting the trustee's view that transfers were admitted by TNB. For example, the trustee made numerous references in their pre-trial *731 and trial memoranda to what they perceived as "transfers" (e.g., plaintiff's Proposed Findings of Fact and Law, BAPR Document 35, p. 2, where trustee argues that a $2 million exchange between Montgomery accounts at TNB is "the transfer"), and TNB countered with references to "alleged transfers" (e.g., TNB's Post-Trial Brief, BAPR Document 46, p. 12). In short, the trustee and TNB engaged in the give-and-take expected of adversarial litigants; review of the Bankruptcy Court's actions under these circumstances, employing the standards articulated above, is appropriate.
Since the Bankruptcy Court departed from the argued positions of both parties in its opinion, and since it is unnecessary to expand on the Bankruptcy Court's findings of fact, this Court will review each of the issues raised by TNB. See In re H & S Transportation, 110 B.R. 827 (M.D.Tenn. 1990).

DISCUSSION
1) THE BANKRUPTCY COURT PROPERLY IDENTIFIED THE EXISTENCE OF AN AVOIDABLE TRANSFER, AS REQUIRED BY 11 U.S.C. § 547(b).
Under Section 547(b) of the 1978 Bankruptcy Code, only the "transfer of an interest of a debtor in property" may be recovered as an avoidable preference, and then only if such a transfer meets each of the elements set out in 11 U.S.C. § 547 (b)(1)-(5), and does not trigger any of the affirmative defenses available through 11 U.S.C. § 547(c).
Appellant TNB contends that the Bankruptcy Court erred by completely failing to identify in its opinion any transfer that improved TNB's position. TNB asserts that "[n]owhere in the Bankruptcy Court's lengthy opinion is there any identification of the transfer or transfers to Third National that are to be avoided. The Court's opinion does not even clearly state whether there was one transfer or several." Appellant's Opening Brief at 16.
TNB argues that each preferential transfer must be identified explicitly: "Each transfer must be identified before a court can determine whether the transfer involved `an interest of the debtor in property.' Also, a court must identify the transfer or transfers before it can apply § 550 and determine the amount of the trustee's recovery on account of a preference...." Appellant's Opening Brief at 16. TNB does not cite any authority, but does cite In re H & S Transportation, supra, and In re Fulgham Construction Corp., 706 F.2d 171, 174 (6th Cir.1983), cert. den. sub. nom Rainer & Assoc. v. Waldschmidt, 464 U.S. 935, 104 S.Ct. 342, 78 L.Ed.2d 310, for the proposition that a transfer, not simply an improvement in position, is required for a preference. TNB goes on to state that the Bankruptcy Court never identified any transfer, but only described the shift of a kite, and that this shift was not itself a transfer.
In a reply brief filed less than a month later, TNB adds a twist to this argument. TNB now contends that the Bankruptcy Court held that the shift of the kite was the transfer, but that the court failed to identify adequately "any transfers forming the basis of the shift." Appellant's Reply Brief at 9. This apparently refers to the lack of any reference to specific transactions.
Findings of fact by a bankruptcy judge will be set aside if they are "clearly erroneous", but here TNB does not contest affirmative findings of fact. Instead TNB complains that the Bankruptcy Court does not identify with the required specificity which, if any, of Montgomery's transactions constituted preferential transfers. Rule 52 of the Federal Rules of Civil Procedure, applicable in bankruptcy proceedings through Bankruptcy Rule 7052, provides that "in all actions tried upon the facts without a jury ... the court shall find the facts specially and state separately its conclusions of law thereon...." A Bankruptcy Court's failure to make detailed findings of fact and law may preclude affirmance, but at least one District Court has added that "[t]his requirement does not entail a written decision in every matter, but rather, merely a brief statement from the *732 bench setting forth the evidentiary basis for findings of fact and identifying the requisite legal conclusions that support the Bankruptcy Court's decision." Hassler v. Assimos, 53 B.R. 453, 456, n. 5 (D.Del. 1985).
In fact there has been a wide range of specificity in Bankruptcy Court, District Court, and Court of Appeals opinions dealing with preferential transfers. Many preference cases involve only one or two contested transactions, and these are usually set out directly. See e.g., In re Tinnell Traffic Services, Inc., 41 B.R. 1018, 1020 (Bankr.M.D.Tenn.1984) (where the exchange of a check from debtor to defendant was described in findings of fact), In re Belknap, Inc., 909 F.2d 879 (6th Cir. 1990) (where the date of transfer was at issue, three checks received at the edge of the preference period were set out in a table), Matter of Eye Contact, Inc., 97 B.R. 990 (Bankr.W.D.Wis.1989) (where an employee's bonus payment constituted a preference, the amount was listed, along with footnotes explaining the basis of the party's calculations).
Other preference cases involve more complex financial transactions; it is here that the disparity in bankruptcy judge's styles of fact-finding becomes pronounced. At one extreme, bankruptcy judges have set out the facts in exhaustive detail. See In re Julien, 127 B.R. 604 (Bankr. W.D.Tenn.1991) (where the Bankruptcy Court listed 85 separate findings, many directly from the parties pre-trial stipulations). Other opinions are more moderate, but still fairly detailed, e.g., In re H & S Transportation, 80 B.R. 441 (Bankr. M.D.Tenn.1987) (where 16 fuel transactions are set out in two tables keyed to their trial exhibit numbers).
Courts also have been affirmed when they have, like Judge Lundin here, merely summarized complex financial transactions. For example, Matter of Prescott, 51 B.R. 751 (Bankr.W.D.Wis.1985), deals in part with deposits made to a debtor grocery store's bank accounts during the preference period, which were then "credited to Prescott's indebtedness" by the defendant bank. Id. at 754. The court found the application to be avoidable preferential transfers, and listed the total amount of the preference, but did not attempt to list any of the deposit amounts. This decision ultimately was affirmed by the Seventh Circuit in an opinion that held in part that "[d]eposits into bank accounts clearly can be transfers under the new Bankruptcy Code." 805 F.2d 719, 729 (1986). Similarly, in Durham v. SMI Industries, 90 B.R. 162 (W.D.N.C.1988), rev'd on other grounds, 882 F.2d 881 (4th Cir.1989), involving "check swapping", a District Court simply made reference to "Trial Exhibit A", without listing the checks outright.
Looking at the issue from a different angle, there are many reported cases involving kiting schemes both simple and elaborate, although not in the context of a preferential transfer.[2] In bankruptcy cases where dischargeability of debts incurred through a kiting scheme (11 U.S.C. § 523) is at issue, the schemes usually are described only briefly. See In re Cooper, 125 B.R. 777 (Bankr.N.D.Ill.1991), In re Lauricella, 105 B.R. 536 (Bankr.9th Cir. 1989). However, cases involving setoffs under 11 U.S.C. § 553 again demonstrate the breadth of Bankruptcy Court fact finding; compare In re T & T Parts Warehouse, Inc., 39 B.R. 399 (Bankr.W.D.Mich. 1984) (providing only a general description similar to the Montgomery decision) with Bridgeport Co. Inc. v. U.S. Postal Service, 39 B.R. 118 (Bankr.E.D.Ark.1984) (which contains a detailed chart of amounts deposited, closing balances, etc.). And in criminal cases, such as those brought for embezzlement by bank employees (18 U.S.C. § 656), kiting schemes usually are described only briefly. See e.g. U.S. v. Giordano, 489 F.2d 327 (2d Cir.1973), U.S. v. Young, 618 F.2d 1281 (8th Cir.1980), cert. den. 449 U.S. 844, 101 S.Ct. 126, 66 L.Ed.2d 52.
*733 In the instant case, TNB's contention that the Bankruptcy Court made no attempt to identify the preferential transfers glosses over bankruptcy Judge Lundin's actual findings of fact. The Bankruptcy Court analyzed a typical day in the operation of Montgomery/Southland's kite, selecting March 18, 1988, a date within the preference period, and described the kiting activity on that day in detail. The Court noted the testimony of Laroy Wolff, a C.P.A. hired by the trustee, who used customized software to record and analyze over 60,000 checks written by Montgomery/Southland on the various accounts involved in the kite, and then the Court stated that "[a]lmost every business day during the preference period and before April 18, 1988, there were similar multi-million dollar transfers of funds among Montgomery controlled accounts at Third National and other Nashville banks that were not tied to the closing of real estate transactions." 123 B.R. at 806. This, combined with the detailed explanation of the history of Montgomery's dealings with TNB and other banks, is well within the boundaries of judicial fact finding set out in cases like Prescott and Durham, and exceeds the level of detail found in non-preference kiting cases like Cooper and Lauricella.
Even if this Court were to find the Bankruptcy Court's opinion insufficient, reversal is not required. "On an appeal the District Court ... may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree, or remand with instructions for further proceedings." Bankruptcy Rule 8013. If the Bankruptcy Court's findings are "silent or ambiguous as to an outcome determinative fact question", remand to the Bankruptcy Court is required. In re Chase and Sanborn, Corp., 904 F.2d 588, 593 (11th Cir.1988), In re Sublett, 895 F.2d 1381, 1383 (11th Cir.1990), Wegner v. Grunewaldt, 821 F.2d 1317, 1320 (8th Cir. 1987). But where the trustee's expert at trial testified that upwards of 60,000 checks were exchanged during the kiting scheme, many of those during the preference period, and where this is backed up by numerous trial exhibits, and succinctly summarized in a published opinion, it is unnecessary to remand and insist that the Bankruptcy Court consume page upon page in the bankruptcy reporters with the minute details of Montgomery's checking accounts. The "transfers" here  the checks passing through the kite during the preference period  were properly and sufficiently identified through the Bankruptcy Court's descriptive summary.
2) PROPERTY INTERESTS OF THE DEBTORS WERE TRANSFERRED TO TNB DURING THE PREFERENCE PERIOD.
TNB's next point on appeal is that regardless of whether the required transfer was properly identified, Montgomery's check kiting scheme did not involve an "interest of the debtor in property" as required by § 547(b).
In order to establish an avoidable preference, any property received by a creditor must be, in fact, the debtor's. Begier v. I.R.S., 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). A check kite creates unauthorized loans. Williams v. U.S., 458 U.S. 279, 281, n. 1, 102 S.Ct. 3088, 3089, n. 1, 73 L.Ed.2d 767, 770, n. 1 (1982). The extent of control over the use of borrowed funds determines whether the debtor has an interest in the loan proceeds. In re Royal Golf Products, 908 F.2d 91 (6th Cir. 1990); Brown v. First Nat'l Bank of Little Rock, 748 F.2d 490 n. 6 (8th Cir.1984); In re Bohlen Enterprises, Ltd., 859 F.2d 561 (8th Cir.1989). It follows that where unauthorized borrowings are concerned, control over the proceeds of the loans also will determine whether a trustee in bankruptcy may recover distributions of borrowed funds as a preference:
A payment to a debtor with borrowed money, however, may constitute an avoidable preference where the loan so used was not made upon the condition that it should be applied to the particular creditor to whom it was paid over. Similarly, a payment made by a third party to a creditor of the defendant, may likewise amount to a preferential transfer, when such payment represents a loan by *734 the third party, and the debtor, rather than the lender, designates the creditors to be paid and controls the application of the loan.
4 Collier on Bankruptcy, ¶ 547.03, 547-28 (15th ed. 1991) (emphasis added).
Also, "it is only where ... the debtor, rather than the third party, has control of the funds that a preference may have been created." Brown v. First Nat'l Bank of Little Rock, 748 F.2d 490 n. 6 (8th Cir. 1984); "[t]he existence of this control determines whether the payments were preferential transfers...." Smyth v. Kaufman, 114 F.2d 40, 42 (2d Cir.1940).
TNB argues that by its nature a check kite generally does not involve a debtor's property. In TNB's view, a debtor who is kiting checks establishes bank accounts with "nominal" funds, then "gives rise to a credit" by exchanging worthless interbank checks, "never using his own funds in the process." Appellant's Opening Brief at 21. Referring to Matter of Smith, 123 B.R. 605 (N.D.Ind.1991), where a simple two check exchange was denied treatment as a preference, TNB argues that where a bank grants provisional credit and honors a check based on deposits not supported by sufficient funds, the transaction is merely a substitution of creditors, and does not involve the debtor's property. TNB characterizes Montgomery's scheme as nothing more than a grand elaboration of the Smith case.
Looking at the facts of this case, the Court does not doubt that Montgomery/Southland had control over the disbursement of funds to various banks. Indeed, the nature of the scheme gave the debtors simultaneous control over both the creation of unauthorized loans and their disbursement, and was managed and perfected through the use of a computer terminal provided to the debtors by TNB. Clearly, Montgomery had sufficient control over the funds he obtained to establish a property interest in them, as required by the Royal Golf, and Bohlen line of cases.
The Smith decision can be distinguished by noting that this is not a case where TNB sought to deny Montgomery the right to make withdrawals while deposits to his accounts were only provisionally credited; here, almost all the checks in the kite were honored. At the very end of the scheme, several deposits at TNB did bounce, but even those were replaced by cashiers' checks drawn on Sovran Bank. Unlike the bank in Smith, TNB was not left in the position of charging Montgomery with an overdraft and petitioning for the debtor's bankruptcy; instead TNB allowed Montgomery to operate for several months with his accounts "one day in arrears". For this privilege, TNB collected substantial "analysis charges" each month that improved their bottom line  so long as the kite stayed afloat. But when activity in Montgomery's accounts got too hot to handle, TNB shut down the cash management system, collected a cash equivalent that zeroed out Montgomery's accounts, and then left the remaining banks in the kite exposed to the risks of Montgomery's unauthorized borrowing.
3) THE DEBTOR'S ESTATE WAS DIMINISHED THROUGH CHECK KITING ACTIVITY.
Transfer of a debtor's property interest to a creditor by itself is not enough to result in a preference. It has long been an implicit requirement of bankruptcy law that to be avoidable, transfers must result in a depletion of the debtor's estate. In re Hartley, 825 F.2d 1067 (6th Cir.1987), In re H & S Transportation, Inc., 110 B.R. 827, 833 (M.D.Tenn.1990). Whether a transfer diminished or depleted the debtor's estate is a "fundamental inquiry" in a preference action. 4 Collier on Bankruptcy, ¶ 547.03, 547-26 (15th ed. 1991). TNB claims that there is no such diminution in a case involving only interbank transfers of "worthless checks". In the trustee's view, the diminution of the estate test is inapplicable here, because Montgomery controlled the funds from the kite; to the trustee, this test is properly applied only where debtor never has possession or control over property. However, the trustee also argues that in any event, there is a diminution of the debtor's estate here, occurring "at the moment *735 the borrowed funds are paid out again." Appellee's Brief at 21.
The trustee's claim that the diminution of the estate test is inapplicable where a debtor has a property interest is in direct opposition to the opinion of this Court, which has stated that "[t]he Sixth Circuit explicitly held [in Hartley] that a trustee may only recover an otherwise preferential transfer to the extent that the transfer depletes the estate ... [d]epletion of the estate therefore remains an essential element to be proven in a preference action." In re H & S Transportation, 110 B.R. at 833 (emphasis added). Collier has explained that to be a diminution, "the transfer must diminish directly or indirectly the fund to which creditors of the same class can legally resort for the payment of their debts to such an extent that it is impossible for other creditors of the same class to obtain as great a percentage as the favored one." ¶ 547.03, 547-26 (15th ed. 1991).
While it is incorrect for the trustee to downplay depletion of a debtor's estate as an essential element of a preferential transfer, the assertion that depletion of the Montgomery/Southland estate occurred through the debtor's illegal kiting activity does accurately describe the circumstances of this case. Certainly, this case involves more than a simple "earmark", where one creditor arranges payment to another immediately before an impending bankruptcy, and it also involves more than just a circle of worthless paper.
Here, Montgomery mixed kited checks with thousands of legitimate ones from his real estate business. After TNB designed and established Montgomery's bank account system, and for many months charged him substantial "analysis fees" for the privilege of running negative balances, TNB extricated itself from the scheme when it deemed the risk to exceed the reward. Under these conditions, where a legitimate real estate business was financed by a check kite, this Court concludes that Montgomery's estate was indeed diminished by the illegal check kiting activity.
4) THE BANKRUPTCY COURT'S AWARD OF PRE-JUDGMENT INTEREST WAS A PROPER EXERCISE OF DISCRETION.
TNB contests the Bankruptcy Court's award of pre-judgment interest on the $2,012,418 judgment for the trustee, arguing that such an award is only appropriate "if the value of the property transferred as a preference is known or can be determined by the parties."[3] Appellant's Opening Brief at 28, citing In re Bellanca Aircraft Corp., 850 F.2d 1275, 1281 (8th Cir.1988) and In re First Software Corp., 107 B.R. 417 (D.Mass.1989). TNB argues that because the Bankruptcy Court's judgment (for $2,012,418) differed from the trustee's demand (for $1,971,978.75), and since the trustee's expert testified that by December 1989 he was still not able to state with certainty that a kite had occurred, a good faith disagreement exists over the amount in dispute, and pre-judgment interest is inappropriate.
The trustee responds that "a wide latitude is to be given to the trial court's discretion, which is not to be reversed absent clear abuse." Appellee's Brief at 25, citing In re Universal Clearing House, 60 B.R. 985, 1001 (D.Utah 1986). Also, an opinion within this Circuit (also written by Bankruptcy Judge Lundin) states that "[i]t has long been the rule in this circuit that a trustee in bankruptcy is entitled to prejudgment interest on preference recoveries." In re Southern Industrial Banking Corp., 87 B.R. 518, 520 (Bankr.E.D.Tenn. 1988). The trustee argues that the approximately $40,400 variance between the trustee's and court's estimation of damages is a trivial amount, that Mr. Wolff's uncertainty was caused by the fact that he was still in the process of inputting the data on Montgomery's checking accounts in December 1989, and that after weighing the equities involved, the Bankruptcy Court concluded *736 that pre-judgment interest was appropriate.
On balance, the Bankruptcy Court acted with discretion in awarding interest to the trustee; TNB's argument that the proportionally small difference between one of the trustee's damage estimates and the court's final award is "a good faith dispute over the amount in issue" is ironic, since TNB has never before contested the amount in issue, other than to argue that they owe nothing. The Bankruptcy Court adopted the testimony of the trustee's expert concerning the exposure of TNB during the preference period, and determined that the greatest extent of that exposure was recoverable by the trustee following TNB's extraction from the kite. While the volume and complexity of transactions in this case may have increased the difficulty of determining the amount to be avoided, this complexity alone does not render the Bankruptcy Court's reliance on testimony presented at trial an abuse of discretion.
In the same vein, the fact that the trustee's expert was unable to state the extent of the kite conclusively in December 1989 is of little significance; the record reveals that he had not yet received certain records from Sovran Bank, so his database was incomplete at that time. Trial transcript at 455-457. In light of this, the Bankruptcy Court's award of pre-judgment interest does not constitute clear abuse, and is affirmed.
NOTES
[1] See e.g. TNB's Memorandum of Law in Support of Summary Judgment, BAPR Document 16, p. 9; Supplemental Memorandum in Support of Summary Judgment, BAPR Document 24, p. 9; Post-Trial Brief, BAPR Document 46, p. 1.
[2] In re Express Liquors, Inc., 65 B.R. 952 (Bankr. D.Md.1986) involves both check kiting and preferential transfers, but does not assist in resolving the issues in this case because the transfer there was the sale of the debtor's business and liquor license.
[3] TNB does not challenge the $242,517 judgment concerning payments against Montgomery's line of credit.