## FIELD v. HARRISON et al.

Circuit Court of Appeals, Second Circuit.
April 4, 1927.

No. 234.

1. Bankruptcy ⏐⏐⏐303(4)—Evidence held to show insolvency of bankrupt at time of transactions alleged to constitute unlawful preferences.

In action by trustee to set aside certain transactions as voidable preferences, evidence *held* sufficient to establish insolvency of bankrupt at time of such transaction.

2. Bankruptcy ⏐⏐⏐303(4)—Evidence held to show that creditor banks had reasonable cause to believe that preferences would result from transactions involved.

Evidence of banks' dealings with bankrupt *held* sufficient to show that banks had reasonable cause to believe that transfers made would effect a preference.

Appeal from the District Court of the United States for the District of Vermont.

Suit by Fred A. Field, trustee in bankruptcy of the Clark & McMaster Piano Company, against Charles H. Harrison, trustee, and others. Decree for defendants, and plaintiff appeals. Reversed and remanded.

The trustee in bankruptcy of Clark & McMaster Piano Company, a Vermont corporation, filed his bill of complaint against the defendants to set aside as voidable preferences certain transactions they had had with the bankrupt. The court dismissed the bill on the ground that the piano company was not proved to have been insolvent at the time of the transactions in question. This is an appeal from that decree.

The facts relating to the transactions attacked as preferences are stated in the opinion of the District Judge as follows:

"The Clark & McMaster Piano Company, the bankrupt, had a checking account with the Capital Savings Bank & Trust Company of Montpelier, also checking accounts with the Clement National Bank of Rutland in the names of J. E. Clark, and J. E. Clark, Special. By a fraudulent scheme of 'kiting checks,' between these banks, drawn on these accounts, the company had on and before the 22d day of September, 1916, become indebted to the Clement National Bank for $14,522 and to the Capital Savings Bank & Trust Company for $5,060. This fraud was not discovered by either bank until September 20, 1916. On that day each bank knew that by reason of the fraud it had been led into paying checks drawn by the company on the other bank which would be returned unpaid, and that by this fraudulent scheme the company was indebted to each bank for the amount stated, notwithstanding those amounts would not show upon the books of the banks until the checks were returned. The next day (September 21st), a conference was had between the banks and the company to consider how the payment of this indebtedness could be made or secured. Mr. J. E. Clark, the president and active manager of the company, informed the banks that his company was solvent and proposed to secure payment of the overdrafts brought about by 'kiting checks' by a mortgage on the company's store at Rutland, and by a pledge of lien notes, leases, and book accounts which it held against its customers. This proposal the banks accepted. The next day (September 22d), the company sold and transferred lien notes, leases, etc., amounting to $8,292.18 to the Clement National Bank, and it credited that amount against the overdraft. At the same time, the company gave this bank its promissory note for $5,583.98, which, with the $650 which the company then had on deposit in the name of J. E. Clark, Special, balanced the overdraft of $14,522 and paid the protest fees of $4.16 on the returned checks. On the same day, the company gave the Capital Savings Bank & Trust Company its promissory note for $5,061.10 (dated September 20th) to pay its overdraft at that bank and the protest fees of $1.10 on the returned check. On the same day, and as a part of the same transaction, the company executed a mortgage on its store at Rutland to Charles H. Harrison, trustee, conditioned to pay all sums of money owing, etc., to the Clement National Bank and the Capital Savings Bank & Trust Company. The company also pledged to the said Charles H. Harrison, trustee, book accounts against its customers amounting to $5,176.99, conditioned to pay all sums of money which it owed to the Clement National Bank and the Capital Savings Bank & Trust Company."

The petition in bankruptcy was filed November 24, 1916. Such further facts as are material will be mentioned in the opinion.

Robert E. Healy, of Bennington, Vt., for appellant.

Marvelle C. Webber and P. M. Meldon, both of Rutland, Vt., and E. H. Deavitt, of Montpelier, Vt., for appellees.

Before MANTON, HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge (after stating the facts as above). [1] The decision of this appeal involves the determination of two questions of fact: Was the piano company insolvent at the time of the transfers to defend-

ants? If so, did the defendants have reasonable cause to believe that the enforcement of the transfers would effect a preference? The questions will be considered in the order stated.

There is no dispute as to the piano company's liabilities. They totaled $51,719. Payment of about $8,000 of this sum had been assumed by the National Piano Company, also a bankrupt, and a dividend of about $4,600 was subsequently received by the plaintiff on account thereof. The right to receive this dividend we shall mention in the tabulation of assets.

Neither McMaster nor Clark, the two principal owners and officers of the piano company, nor Miss Rooney, its only bookkeeper, could be had as witnesses. Therefore the evidence as to the amount and value of the bankrupt's stock in trade, fixtures, etc., in its three stores is based largely on what was found and inventoried by the receiver on December 4, 1916. The court found this inventory as follows: At Claremont, $1,835.75; at Rutland, $4,152; at Montpelier, $2,221.85—making a total of $8,309.60. The amount actually realized thereon was $6,457.31. The sales register from September 22 to November 10, 1916, when business ceased, purports to show net sales of $4,076.52, from which the court deducted a profit of 33⅓ per cent., leaving the value of the goods sold $2,717.68. Taking the receiver's inventory of $8,309.60, and the value of goods sold subsequent to September 22, $2,717.68, gave a total value of $11,027.28 for stock in trade, fixtures, etc., on September 22, 1916. There was some conflicting testimony of witnesses as to the stock and its value on the date in question, tending to decrease or increase this valuation, but we are satisfied with the valuation adopted by the court.

The real estate was subject to a mortgage and was sold for the amount of the mortgage debt, $7,878.13. Certain witnesses placed a higher valuation upon it. The court adopted a value of $10,000, and we are satisfied with this figure.

Another asset of the piano company was a claim against the National Piano Company which had been adjudicated a bankrupt in Massachusetts, June 19, 1916. This claim was based on a contract of the National Company to take shares of stock in the piano company in exchange for notes of the latter held by the National. In violation of this contract, the National had indorsed such notes, aggregating about $8,000, to innocent purchasers for value. The notes were valid claims against their maker, and are therefore included in the liabilities of the piano company. Subsequently, dividends were paid by the National's trustee in bankruptcy, aggregating $4,578, on account of the claim of the piano company. As hereinbefore mentioned, the District Judge treated this dividend as reducing correspondingly the liabilities of the piano company. We think it more accurate to consider the right to a dividend as an asset. There is no evidence as to the value of this asset on September 22, 1916, except the fact that it subsequently (how many years later does not appear) realized $4,578. To suppose that any one would have paid that sum for the claim on September 22 seems to us a mere assumption. However, as the burden of proof was on the plaintiff to establish insolvency, he can scarcely complain if the asset in question is valued at what it realized rather than at a higher figure.

Outside of notes and accounts receivable, therefore, the assets of the bankrupt on September 22, 1916, were as follows:

Cash in bank paid to Clement Bank........ $ 650 00
Stock in trade, fixtures, etc., in stores.... 11,027 28
Real estate ...................................... 10,000 00
Claim against National Company.......... 4,578 00
                                                  _____
                                                  $26,255 28

Its liabilities were $51,719, leaving $25,450 to be accounted for by receivables, if solvency existed on the date in question.

On September 22, 1916, the piano company turned over to the Clement Bank lien notes of the face value of $8,292, and pledged to Harrison as trustee for the two banks book accounts amounting to $5,177. The Clement Bank also held notes of approximately $3,100 to secure an old loan. The Capital Bank held $6,000 or more to secure an old loan it had made to the piano company. When Field was appointed trustee in bankruptcy he found no notes or accounts receivable except a few on which he collected $360. The court's opinion states that some receivables had been assigned to the National Piano Company, John Church Company, and H. R. Jordan. We find no evidence to support this finding. Blanchard's testimony that he knew the piano company was indebted to the National Piano Company and "they had security, as I understood it," seems to be the only testimony bearing on it, and that we regard as inadequate. Therefore the receivables existing on September 22, and located as in some one's possession, total about $23,000. That they were not worth their face value is obvious from the fact that the $13,470 face value of notes and

accounts assigned to the Clement Bank and Harrison, trustee, realized only $9,700, and all had been collected except perhaps $100 worth.

However, plaintiff's Exhibit 9 which is headed "Daily Statement of Business" and dated September 21, 22, 1916, contains three columns the final item in each of which is entitled "Net Unpaid Charge Sales to Date." By adding together the figures in the three columns set opposite this heading, a total of $44,152.25 is obtained. The court accepted this as proof that customers were owing the piano company this sum and valued the accounts at five per cent. less than their face, giving a value of $39,749. Taking this valuation for the receivables showed the piano company solvent by more than $13,000. It is quite impossible for any one unfamiliar with the business to understand the various items which appear on this exhibit. There is nothing to indicate that the three columns represent respectively, business done at the three stores. Only on this assumption is there reason to add the items together in order to get the total of "net unpaid charge sales to date." There is nothing to show how long a period is covered "to date." Conceivably the total figures cover all credit sales made since the beginning of the business and include many outlawed or worthless credits. In view of the evidence in the case which tends to show insolvency of the piano company on September 22, we do not think the unexplained figures on this exhibit should be deemed to show that the company owned receivables having a fair valuation of $39,000.

The evidence shows a debtor doing a smallish business in musical instruments, victrola records, sheet music, etc., in country towns; for weeks prior to September 22 he has been dishonestly "kiting checks"; his Montpelier store has been attached on a claim for about $2,000; he owes the banks $9,000 in addition to the indebtedness of $19,000 incurred by check kiting; his stock in trade has an inventory value of only about $11,000; his cash in bank is $650; his only real estate is mortgaged close to its full value; his insolvency two months later is so complete that the creditor's dividends will be insignificant; his receivables were assigned or pledged to such an extent that the trustee in bankruptcy found only $360 of collectable accounts. That the fair value of the assets of such a debtor was $51,700 seems to us so incredible that we cannot accept the ambiguous entries on Exhibit 9 as overcoming the strong inferences of insolvency arising from the facts above detailed. We find that the evidence established the insolvency of the piano company on September 22, 1916.

[2] The District Judge found that the defendant banks were put upon inquiry as to the solvency of the Clark Company when they took security for the payment of the overdrafts. Not only were the overdrafts large, but they had been brought about by dishonesty. The banks knew of the Montpelier attachment. Their hurried conference, their willingness to believe, without investigation, Clark's statement of his solvency, in view of his previous dishonest conduct toward them, the unusual form which the transaction took, without any agreement between them as to their respective shares in the security conveyed to Harrison as trustee, the acceptance by the Clement Bank, in partial payment, of customers' notes at face value, are only comprehensible on the theory that they were seeking to save what they could from a debtor in serious financial difficulties. We have no hesitation in finding that the defendants had reasonable cause to believe that the enforcement of the transfers would effect a preference.

The contention that the transactions constituted a present loan on new consideration because the proceeds were credited to the bankrupt is too extravagant to require comment.

The decree is reversed, with costs in both courts, and the cause remanded for further proceedings consistent with the foregoing.