**In re N. Eddie MONTGOMERY and Southland Escrow Services, Inc., Consolidated Debtors.**

**John C. McLEMORE, Trustee, Plaintiff,**

v.

**THIRD NATIONAL BANK IN NASHVILLE, Defendant.**

**Bankruptcy No. 388–03712.
Adv. No. 389–0119.**

United States Bankruptcy Court,
M.D. Tennessee.

Feb. 8, 1991.

Edwin M. Walker, Robert Garfinkle, McMackin, Garfinkle, McLemore & Walker, Nashville, Tenn., for trustee.

Bradley MacLean, Katherine S. Allen, Farris, Warfield & Kanaday, Nashville, Tenn., for Third Nat. Bank.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

The issue is whether Third National Bank received a preference when it was

extracted from the debtors' check kiting scheme during the 90 days before this involuntary bankruptcy. Third National Bank received an avoidable preference. The following are findings of fact and conclusions of law. Bankr.R. 7052.

## I.

Eddie Montgomery was a lawyer. Through his company, Southland Escrow Services, Inc., Montgomery conducted thousands of real estate closings in Middle Tennessee.

In July of 1987, Montgomery met with officers of Third National Bank ("TNB") to discuss banking problems in his real estate closing business. Montgomery was a customer of another bank. He complained to TNB of cash flow problems resulting in overdrafts in his accounts and large "overdraft charges."

A young Third National Bank officer working his first account development and two more senior bank officers studied bank statements from Montgomery's other bank and visited Montgomery's offices to analyze the real estate closing operation. They presented a detailed written proposal to solve Montgomery's banking problems: a "cash management system" not unlike the arrangement discussed by the Sixth Circuit in *First Fed. of Michigan v. Barrow*, 878 F.2d 912 (6th Cir.1989). The proposal included three new bank accounts, a "lock box," a $500,000 line of credit and a data terminal. Montgomery accepted the proposal.

A Main Funding Account was established at TNB in Nashville to concentrate all incoming funds from real estate closings. Checks were to be deposited to the Main Funding Account by delivery to a "lock box" at the Third National Operations Center in Nashville. Using TNB's "in-house concentration system," funds would be taken from the Main Funding Account once a day to cover disbursement checks presented that day. The balance remaining in the Main Funding Account would be automatically invested each day to earn interest for Montgomery.

Montgomery was to write checks on two disbursement accounts: a Controlled Disbursement Account ("CDA") and a Zero Balance Account ("ZBA"). The CDA was established at an affiliate bank in Oak Ridge, Tennessee. TNB explained that locating the CDA at its affiliate would gain "days of float" for Montgomery because checks clear the affiliate bank only once in the morning of each business day.

A second disbursement account, the ZBA, was established at Third National Bank in Nashville. The ZBA account was supposed to be similar to the CDA in that "at the end of the day, the bank will make a bookkeeping transfer of funds from the [Main Funding Account] to cover the checks that have cleared." Unlike the CDA, the ZBA would clear checks throughout the day. It was recommended that the ZBA be used for "local checks."

The "brain" of the system was INTER-LINK, a "modular automated cash management system." From a computer in his office, Montgomery could use INTERLINK to determine the ledger and collected balances, the amount of "float" and "detailed credit and debit information on all ... accounts." As TNB explained, "with this balance information the capability to maximize the utilization of your cash balances is possible."

By implementing the cash management system, TNB estimated Montgomery would realize $42,246 in annual investment income.

As a condition of the cash management system, Third National Bank required a $500,000 line of credit secured by land owned by Montgomery. The loan documents state the line of credit was created "for the sole purpose of covering overdrafts which occur in borrowers' trust accounts ... caused by delays in collecting checks deposited by borrower...." It is stipulated that "advances under the line of credit were extended for the purpose of covering ledger overdrafts that occurred in the Funding Account."

The cash management system designed by TNB never worked as described in its sales proposal. Southland never made sig-

nificant use of the CDA at TNB's affiliate; rather, disbursement checks were written on the ZBA account in Nashville. Deposits of incoming checks from real estate closings were accomplished by delivery to branch offices of Third National Bank in Nashville rather than through the "lock box."

Contrary to the Bank's proposal, the Third National Bank computer system was not able to "zero out" the ZBA account at the end of each business day. Instead, checks presented against the ZBA were recorded as an "overdraft" on the Bank's ledgers and this overdraft was carried on the Bank's books from the day of presentment to the next day. On the next day, a bank employee would internally debit the Main Funding Account in the amount necessary to "zero out" the negative balance showing in the ZBA from the day before. This process was described as "one day in arrears." Debiting the Funding Account to cover the "overdraft" in the ZBA account occurred without regard to whether there were funds in the Funding Account to cover the ZBA checks presented the day before. If the debit of the Funding Account exceeded its balance, an overdraft notice would be generated the following day—two days after presentment of the ZBA items that created the overdraft.

Though TNB predicted large *collected* balances would emerge in the Main Funding Account which would then earn substantial investment income, the opposite was true—there were never collected balances in the Funding Account and no investment income was earned. Incoming deposits to the Main Funding Account appear as ledger entries on the day received. These funds were immediately available to Montgomery, but deposits were considered "uncollected" for either zero, one or two days, depending on the "Availability Schedule" applicable at Third National Bank in Nashville through the Federal Reserve. Almost all deposits to the Funding Account occurred at a time of day and involved drawee banks for which the Availability Schedule required at least one day before the items were "collected funds." As a result, the daily use of the balances show-

ing in the Funding Account was a use of *uncollected* funds which immediately triggered draws against the line of credit.

The cash management system began operating in late August, 1987. On August 31, 1987, $429,000 of the $500,000 line of credit was drawn to cover "overdrafts" on the Funding Account. By September 9, 1987, the entire $500,000 line had been consumed. After a brief reduction in the line of credit, the line was again fully extended on September 18, 1987. The line remained fully extended until it was converted to a term note on March 10, 1988. No principal reduction occurred on this debt until May of 1988.

After exhaustion of the line of credit, the cash management system did not collapse, but continued with a major difference. Instead of drawing against the line of credit, TNB charged Montgomery for the use of uncollected funds by calculating the "average (negative) collected balance" for the Funding Account. The Bank continued to debit the uncollected balance in the Funding Account to cover the "overdraft" showing in the ZBA account and for other purposes. This drafting of uncollected funds created continuous "ledger overdrafts" in the Funding Account that could not be covered by the line of credit so the Funding Account produced "large negative average collected balances." At the end of each month, Third National Bank charged Montgomery "analysis charges" calculated as 10.75 (sometimes 11.0 or 10.5) percent times the "average collected balance" in the Funding Account.

The "analysis charges" were not limited to the use of uncollected balances in the Funding Account. Because the ZBA account always showed a large "overdraft"—reflecting that the Bank was incapable of zeroing out the ZBA each day—Third National Bank applied the same 10.75 (11.0 or 10.5) percent "analysis charge" to the ZBA account. For example, in January of 1988, the average "overdraft" showing in the ZBA account was $1,599,969. The average collected balance for the Funding Account was (negative) $1,758,963. Third National added these two numbers together, then

applied a 10.75% "analysis charge" against the total "average collected balance" of (*negative*) $3,358,933. This generated an analysis charge for January of $30,850. This amount was collected by debiting the Funding Account. Analysis charges for February, 1988, totalled $28,636; for March, $28,487; for April, $16,549. These analysis charges were in addition to the accrual of interest on the fully extended line of credit.

The Bank's cash management proposal does not mention "analysis charges." Bank officers knew Montgomery had experienced large "overdraft" charges at his previous bank, but "analysis charges" were "not expected" and thus not mentioned in the TNB sales proposal. Two different groups of bank officers were involved at TNB—one set designed and sold the cash management system; different officers were responsible for the line of credit. These separate bank officers professed not to meddle in the responsibilities of each other with the result that the officers for the cash management accounts claim not to have known that the line of credit was immediately and permanently consumed by the use of uncollected funds. Until January, 1988, no one at the Bank admits knowledge of the huge "analysis charges."

Notwithstanding the internal confusion, bank officers were concerned about Montgomery's relationship to the Bank at least as early as November, 1987. On November 16, 1987, bank officers confronted Montgomery with evidence that check kiting had occurred in a TNB account for "Southland Properties." This other account was controlled by Montgomery and an associate but was not involved in the cash management system. Montgomery denied knowledge of any check kiting in this other account. TNB officers imposed the "usual" remedy for suspected check kiting—they closed the suspicious bank account.

In late January, 1988, TNB officers met with Montgomery to "review . . . cash management system and account analyses as a result of large deficit collected balances." Montgomery was "very pleased with his cash management." One officer noted Eddie was making money "hand over fist" in his real estate closing business and Mr. Montgomery "had no problem with paying a [sic] $11,000 analysis charge for December." The Bank officers were not as happy. They commenced an "in depth analysis" of the Southland cash management system and determined to meet with Montgomery during the following week to "work out a plan of action we need to take in 1988 regarding his account problems."

TNB officers met again with Montgomery during the first week of February, 1988 to "discuss with customer the severe deficit collected balances experienced each month." At the Bank's insistence, Montgomery agreed "to take action to reduce the negative average collected balances in his account." The Bank officers at this meeting knew Southland was "into trouble with negative collected funds." The officers had discussed among themselves moving Montgomery out of the Bank. They admitted that "events were a little unusual" with respect to Montgomery's accounts. The $30,000 analysis charge for January was the largest ever seen by these officers.

TNB officers met again with Montgomery on February 10, 1988. Montgomery presented a detailed, written proposal to change the way he used the cash management system, including changes in the conduct of his real estate closing business. To cure the "severe deficit collected balances," Montgomery proposed to reduce the average uncollected balances beginning February 12 from $1,350,000 to zero on April 1. During April and May, he proposed to reduce the line of credit and to eliminate the line by the end of May. To accomplish these changes in his relationship to TNB, Montgomery proposed to change the way he conducted payoffs at real estate closings; he proposed to transfer funds from Sovran Bank to Third National Bank; he proposed to set up a line of credit at Sovran Bank and he offered to "deposit with Third the sum of $5,000 per month to be held and pledged against the line."

An internal bank memo recites that TNB "deleted the cash management services" for the debtors on April 7, 1988. Montgomery was called into the Bank on April 11 to discuss the mechanics of stopping the system.

Activity in the Southland accounts changed abruptly between April 18 and April 21. Southland stopped using the ZBA account for routine disbursements. Two deposits to the Funding Account "bounced" and were replaced with cashiers' checks totalling $320,000 drawn on Sovran Bank. Deposits to the funding account stopped on May 3. The Funding Account was used on May 9 to make a $240,000 payment to Third National Bank on the line of credit (converted to a term loan). By the end of the second week in May, the balances in all TNB accounts were reduced to insignificance.

Involuntary Chapter 7 petitions were filed against Southland and Montgomery on June 3, 1988. The trustee determined there was a deficit of several million dollars in the debtors' bank accounts.

An accountant hired by the trustee used specially designed software to analyze more than 60,000 checks and deposit items involving 28 bank accounts used by the debtors in the months before bankruptcy. Receipt and disbursement information was collected from 6,000 real estate closing files. These data were compared to bank statements from the various banks, including Third National Bank. The evidence shows, without contradiction by the Bank, that the debtors' accounts at Third National Bank were part of a colossal check kiting scheme.

March 14, 1988 was typical of the operation of the debtors' check kite during the preference period. On March 14, the bank statement for the ZBA account at Third National Bank showed an overdraft of $2,056,721. Not included in that amount were checks totalling $1,591,799 written on the ZBA account and already presented and posted as an increase in cash in a Montgomery controlled bank account at Sovran Bank. On March 14, the bank statement for this Montgomery controlled account at Sovran Bank showed a balance of $1,705,-375. Not included in that amount were checks totalling $1,625,600 written on the Sovran account and already presented and posted as an increase in cash in the Main Funding Account at Third National. The $1,591,799 drawn on the ZBA account at Third and the $1,625,600 drawn on the Montgomery controlled account at Sovran were uncollected funds in use by the debtors on March 14 that do not appear as decreases in the respective drawee bank balances on that day because the items representing these amounts were "floating" in the collection process between the banks.

Almost every business day during the preference period and before April 18, 1988, there were similar multi-million dollar "interbank" transfers of funds among Montgomery controlled accounts at Third National and other Nashville banks that were not tied to the closing of real estate transactions. The volume of "interbank" checks exceeded by almost four-to-one the banking transactions traceable to legitimate real estate closings. The precision with which Montgomery timed and shifted this float among the banks betrays an unintended use of INTERLINK—to determine how much and where to fuel the kite to keep it floating.

Mathematically, the kite against Montgomery's TNB accounts on March 14, 1988 was slightly over $1,500,000. During the 90 days before bankruptcy and prior to April 19, 1988, the total kite at TNB ranged from $642,856 to $2,012,418. Between April 19 and April 21, the kite at TNB went from $1,606,111 to zero.

Beginning about April 18, Montgomery stopped writing "interbank" checks on the ZBA account at Third National for deposit to Montgomery controlled accounts at other banks. However, "interbank" deposits continued into the Funding Account at TNB from Montgomery controlled accounts at other Nashville banks. The effect was dramatic—the kite at TNB stopped; the kite shifted from TNB to Montgomery accounts at other banks. The decrease in ZBA activity at TNB is mirrored by simul-

taneous increases in account activity at Metropolitan Federal, Sovran Bank and Investors Federal. At the involuntary petitions, Sovran Bank was left with an overdraft in excess of $2,000,000.

On January 30, 1989, the trustee made demand on Third National Bank for return of preferential transfers in the approximate amount of $2,000,000.

## II.

By stipulation and previous orders on motions for summary judgment, the "insolvency" and "greater percentage test" elements of the trustee's burden under 11 U.S.C. § 547(b) have been established. TNB contests the existence of an "antecedent debt" and asserts the § 547(c)(1) and (c)(2) defenses of "contemporaneous exchange for new value" and "ordinary course of business."

### A. CHECK KITING CREATES AN "ANTECEDENT DEBT" FOR PREFERENCE PURPOSES

Check kiting is a form of fraud which creates unauthorized loans between a bank and its customer. As explained in a leading treatise:

> The kite is a type of fraud by which the malefactor uses at least two accounts at separate banks and covers overdrafts on one bank by writing overdrafts on the other bank. The malefactor takes advantage of the float period between the moment of deposit and the moment of payment by each drawee bank. He also takes advantage of both banks' willingness to pay checks drawn against uncollected funds....
>
> A constant flow of worthless checks between the two accounts keeps the kite alive as the numbers grow larger and larger....
>
> [T]he kite usually continues until one of the two banks refuses to honor checks drawn against uncollected funds....

B. Clark, *The Law of Bank Deposits, Collections and Credit Cards*, para. 5.03(1) (3rd ed. 1990). *See* Hill, *A Drawee's Right to Restitution of Mistaken Payments under Articles 3 and 4 of the U.C.C.: A Plea for Clarification*, 7 J.LAW & COM. 293, 313 (1987) (a check kite is "an illegal scheme used to artificially inflate ones credit through a continuous flow of checks written on insufficient funds. By utilizing two or more banks, an overdraft is constantly being extinguished with fresh deposits written on NSF accounts.") Third National Bank's internal manual for its kite detection system defines check kiting as "a scheme ... to obtain unauthorized credit ... a method whereby a depositor ... utilizes the time required for checks to clear to obtain an unauthorized loan without any interest charge." At trial, TNB bank officers and the trustee's expert witness concurred that a check kite effects the creation of unauthorized loans between the customer and the Bank.

In its footnotes to *Williams v. United States*, 458 U.S. 279, 281 n. 1, 102 S.Ct. 3088, 3089–90 n. 1, 73 L.Ed.2d 767 (1982) the Supreme Court gave this typical example:

> "The check kiter opens an account at Bank A with a nominal deposit. He then writes a check on that account for a large sum, such as $50,000. The check kiter then opens an account at Bank B and deposits the $50,000 check from Bank A in that account. At the time of deposit, the check is not supported by sufficient funds in the account at Bank A. However, Bank B, unaware of this fact, gives the check kiter immediate credit on his account at Bank B. During the several-day period that the check on Bank A is being processed for collection from that bank, the check kiter writes a $50,000 check on his account at Bank B and deposits it into his account at Bank A. At the time of the deposit of that check, Bank A gives the check kiter immediate credit on his account there, and on the basis of that grant of credit pays the original $50,000 check when it is presented for collection.
>
> By repeating this scheme, or some variation of it, the check kiter can use the $50,000 credit originally given by Bank B as an interest-free loan for an extended period of time. In effect, the check kiter

can take advantage of the several-day period required for the transmittal, processing, and payment of checks from accounts in different banks...."

Innumerable federal cases beginning with the often-cited decision of the Seventh Circuit in *Federman v. United States*, 36 F.2d 441 (7th Cir.1929), *cert. denied*, 281 U.S. 729, 50 S.Ct. 246, 74 L.Ed. 1146 (1930) recognize that check kiting is a scheme to defraud a bank through the creation of unauthorized loans or credits. *See Conroy v. Shott*, 363 F.2d 90 (6th Cir.), *cert. denied*, 385 U.S. 969, 87 S.Ct. 501, 17 L.Ed.2d 433 (1966); *McCuskey v. National Bank of Waterloo (In re Bohlen Enters., Ltd.)*, 859 F.2d 561 (8th Cir.1988); *Farmers & Traders State Bank of Meredosia v. Magill (In re Meredosia Harbor & Fleeting Serv., Inc.)*, 545 F.2d 583 (7th Cir.1976), *cert. denied, Farmers & Traders State Bank of Meredosia v. Magill*, 430 U.S. 967, 97 S.Ct. 1649, 52 L.Ed.2d 359 (1977); *Davis v. Security Nat'l Bank of Nevada*, 447 F.2d 1094 (9th Cir.1971); *Bostian v. Levich*, 134 F.2d 284 (8th Cir.1943); *Daniels, v. Thornton Bank of Nevada (In re Isbell)*, 24 B.R. 234 (Bankr.W.D.Mo.1982); *Sailstad v. Hendrickson (In re Clemente)*, 15 B.R. 937 (Bankr.N.D.Ohio 1981); *In re 7H Land and Cattle Co.*, 8 B.R. 22 (Bankr.D.Nev. 1980).

■ Unauthorized loans created through the fraud of a check kiting scheme constitute "debts" for bankruptcy purposes. The now familiar statutory construction leading to this conclusion was summarized by the United States Court of Appeals for the Sixth Circuit in *First Fed. of Michigan v. Barrow*, 878 F.2d 912, 917 (6th Cir.1989):

(1) "debt" means a liability on a claim. 11 U.S.C. § 101(11).

(2) "claim" means—

(A) Right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or

(B) A right to an equitable remedy for breach or performance if such a breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

11 U.S.C. § 101(4).

(3) "creditor" means—

an entity that has a *claim* against the debtor that arose at the time of or before the order of relief concerning the debtor.

11 U.S.C. § 101(9)(A) (emphasis added).

The legislative history of the Bankruptcy Code evidences Congress' desire to provide the broadest possible definition of "claim" when it enacted Section 101(4) (footnote omitted). *See Ohio v. Kovacs*, 469 U.S. 274, 279, 105 S.Ct. 705, 708, 83 L.Ed.2d 649 (1985); *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214, 1219 (9th Cir.), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988).

■ The Sixth Circuit recognizes that a debt for preference purposes arises at the moment of a debtor's fraud. In *First Fed. of Michigan v. Barrow*, 878 F.2d 912 (6th Cir.1989), the debtors were in the business of arranging and managing mortgage loans. The debtors operated from a network of "zero balance accounts" and a central depository account—a cash management system (like that designed by TNB). When cash flow became insufficient to service its mortgages and make payments to investors, Salem used the central depository account to commingle all incoming funds, including "trust fund" deposits by homeowners, mortgage payments, rental payments and loan advances. The commingled funds were used indiscriminately as a reservoir to make disbursements to favored creditors and others. After bankruptcy, the trustee brought preference actions to recover funds paid from the central account during the 90 days prior to bankruptcy. The defendants argued the absence of antecedent debt. The Sixth Circuit easily dispatched the argument:

When the debtors ... elected to implement banking practices and procedures

that were calculated to facilitate the manipulation, diversion and misappropriation of collected mortgage payments, they realigned the configuration of certain debtor/creditor relationships....

[T]he debtors' conversion of the mortgage payments had occurred at the moment when the identifiable funds were deposited into Salem's negative balance Central Account from which transfers were made to satisfy debtors' pre-existing indebtedness ... The instant case is analogous to *Feinblatt v. Block,* 456 F.Supp. 776 (D.Md.1978), *aff'd in relevant part, modified in part, unpublished per curiam,* 605 F.2d 1201 (4th Cir.1979), wherein it was stated:

> *Kline's misappropriation of Block's money made him Block's debtor at the time of the misappropriation....*

*Barrow,* 878 F.2d at 917–918.

The debtors' check kiting was a misappropriation or conversion of TNB's money. *Walser v. International Union Bank (In re Cohn),* 21 F.2d 294, 296 (2d Cir.1927). Check kiting realigned the ordinary debtor/creditor relationships at work in the cash management accounts by rendering Montgomery and Southland the Bank's debtors. The unauthorized loans generated by the debtors' kiting of checks gave rise to a "right to payment" in Third National Bank.

That the extension of credit effected by the check kite was not authorized is of little consequence in preference analysis. As the Sixth Circuit recognized in *First Fed. of Michigan v. Barrow,* 878 F.2d at 918:

> '[A] willing extension of credit is not necessary in order to create an antecedent debt under the preference provision of the [Bankruptcy] Act ... [T]o the contrary, it is a well settled rule that property converted, embezzled, or otherwise taken by the bankrupt, or obtained by him by fraud, can [support] ... a preference....' (quoting *Feinblatt v. Block,* 456 F.Supp. 776 (D.Md.1978), *aff'd in relevant part, modified in part, unpublished per curiam,* 605 F.2d 1201 (4th Cir.1979).

The "absence of an antecedent debt" argument has been rejected in preference cases involving other schemes to defraud. For example, *Wootton v. Barge (In re Cohen),* 875 F.2d 508, 508 (5th Cir.1989) involved a multi-million dollar "sham stock brokerage business" operated by the debtor as a "typical Ponzi scheme." A Ponzi scheme is a fraud whereby a debtor attracts "investors" who advance funds in exchange for promises of high rates of return. *See* pages 814–15, *infra.* The initial "investors" are usually repaid through the attraction of later investors. The last investors are left with unsecured claims against an insolvent "business." Earlier investors who were repaid by later investors end up as defendants in preference actions. In *Cohen,* the Fifth Circuit found "no merit" to the argument by an earlier investor that there was no antecedent debt to support recovery of payments by the debtor during the preference period:

> This assertion flies in the face of the bankruptcy court's finding that [the debtor] defrauded [the defendant] and the other investors by never or rarely purchasing stock for them and having no intention of making money for them in the stock market. Regardless whether [the defendant's] transactions with [the debtor] create claims in the nature of contract, based on breach of [the debtor's] obligation to invest in stock, or in fraud, they are nevertheless claims as defined by the Bankruptcy Code....
>
> The claims may be characterized in contract or fraud, but they are claims in bankruptcy nevertheless.

*Cohen,* 875 F.2d at 509–510.

It is fundamental to perpetration of a check kite that the unauthorized debt is prior in time—"antecedent"—to transfers by the customer to cover the fraud. The trustee's uncontradicted evidence of how Montgomery used the cash management system at TNB during the preference period showed that unauthorized loans at TNB were subsequently "covered" by checks kited on bank accounts under the debtors' control at other banks. It is not known precisely when the kite began or at what

banks. TNB was fully mired in the kite by March 1, 1988, before the preference period began on March 5. TNB was extracted from the kite during the preference period.

Third National Bank would distract attention from its unauthorized debtor/creditor relationship with Montgomery to a microscopic analysis of its internal account ledgers. TNB argues it never was a creditor of Montgomery because its ledgers show only the "trading" of deposits to the Main Funding Account for the payment of checks drawn on the ZBA account.

The unauthorized loan caused by a check kite "floats" among the institutions involved as kited items move from account to account. This unauthorized debt cannot be documented by looking at one bank's ledger entries. The kite is "found" by reconciling the uttering, the deposit, the presentment and the collection of items moving among controlled accounts at different banks—the process carried out with painstaking detail by the trustee's expert. That the unauthorized debt hidden in a check kite will not appear on the books of the victims has long been recognized by the courts. In 1927 in a preference action by a bankruptcy trustee arising out of a check kiting scheme, the United States Court of Appeals for the Second Circuit relied upon the following facts stated by the district court in *Field v. Harrison*, 18 F.2d 729, 729 (2d Cir.1927):

> By a fraudulent scheme of 'kiting checks,' between these banks, drawn on these accounts, the company had on and before the 22d day of September, 1916, become indebted to the Clement National Bank for $14,522 and to the Capital Savings Bank & Trust Company for $5,060. This fraud was not discovered by either bank until September 20, 1916. On that day each bank knew that by reason of the fraud it had been led into paying checks drawn by the company on the other bank which would be returned unpaid, and that *by this fraudulent scheme the company was indebted to each bank for the amount stated, notwithstanding those amounts would not show upon the books of the banks until the checks were returned* (emphasis added).

TNB argues from *Bernstein v. Alpha Assoc., Inc. (In re Frigitemp Corp.)*, 34 B.R. 1000 (S.D.N.Y.1983), *aff'd on other grounds*, 753 F.2d 230 (2d Cir.1985) that Montgomery's use of uncollected funds in the Main Funding Account did not create debt for preference purposes. In *Frigitemp*, a bankruptcy trustee argued that a preferential transfer occurred under § 60 of the former Bankruptcy Act when a bank permitted "provisional credit" for the deposit of a check drawn on another bank and the depositary bank subsequently received funds to cover the provisional credit during the preference period. The district court concluded that the "provisional credit" was either a "loan secured by the check or [was] simply too 'provisional' to be treated as a debt for bankruptcy purposes, ..." *Frigitemp*, 34 B.R. at 1015–1016.

*Frigitemp* stops short of analysis relevant to this case. *Frigitemp* is not a fraud case. The district court in *Frigitemp* had no reason to determine whether the fraudulent misappropriation of funds through a check kiting scheme constitutes "debt" for bankruptcy purposes. *Frigitemp* cites with approval only one preference case involving fraud and in that case the Ninth Circuit observed it was "beyond question" that a bank received an avoidable preference when it recovered credits obtained by the debtor from the bank through "a scheme of 'kiting' in connection with its account...." *Davis v. Security Nat'l Bank of Nevada*, 447 F.2d 1094, 1095–96 (9th Cir.1971). The *authorized* use of "provisional credit" is a precondition to perpetration of a check kiting scheme, but the authorized use of "provisional credit" does not necessarily involve fraud or check kiting. The Sixth Circuit reached the relevant question in *First Fed. of Michigan v. Barrow*, 878 F.2d 912 (6th Cir.1989) wherein it concluded that a debtor's fraudulent misappropriation of bank deposits creates debt for bankruptcy purposes.

Though not necessary to the outcome of this proceeding, the conclusion in *Frigitemp* that the use of provisional credit does not create a debt was not accepted by other

courts at the time, would not be consistent with the expanded definition of "debt" and "claim" under the 1978 Code, and is not consistent with the evidence in this proceeding. Other courts, interpreting the same technical relationships from the Uniform Commercial Code relied upon in *Frigitemp*, concluded under the former Bankruptcy Act that the use of provisional credit reverses the ordinary debtor/creditor relationship between a bank and its depositor. For example, in *Plotkin v. Sunflower Beef Packers, Inc. (In re Hudson Valley Quality Meats, Inc.)*, 29 B.R. 67, 74–75 (Bankr.N.D.N.Y.1982), cited but not fully analyzed by the court in *Frigitemp*, Judge Berke correctly observed that the debtor "became indebted" to its bank when it used "provisional credit" for deposited items in its regular operations. The concepts of "debt" and "claim" applicable under the Bankruptcy Act in *Frigitemp* were broadly expanded by the 1978 Code. *Ohio v. Kovacs*, 469 U.S. 274, 279, 105 S.Ct. 705, 708, 83 L.Ed.2d 649 (1985) ("Congress desired a broad definition of a 'claim' ..."); *Kelly v. Robinson*, 479 U.S. 36, 42, 107 S.Ct. 353, 357, 93 L.Ed.2d 216 (1986) ("... Congress' intent to broaden the definition of 'debt' from the much narrower definition of the Bankruptcy Act of 1898."); *Pennsylvania Dep't of Public Welfare v. Davenport*, — U.S. ——, ——, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588, 596 (1990) ("Congress chose expansive language ... reflects Congress' broad rather than restrictive view ... 'broadest possible' ... all legal obligations ..."). Under the Code's expanded concept of debt, a customer's contingent liability to repay its bank for the use of provisional credits if the underlying items prove uncollectible is a right to payment that would support preference avoidance on appropriate facts. *See* TENN.CODE ANN. § 47–4–212 (bank's right to revoke provisional credit, to charge back the amount of any credit given and to obtain refund from its customer); TENN.CODE ANN. § 47–4–207 (warranty of customer to "take up the item"); TENN.CODE ANN. § 47–4–208 (security interest of bank to extent it gives provisional credit to its customer). *See also* TENN.CODE ANN.

§ 47–3–414 (endorser's liability to subsequent holder).

The conduct of TNB in this case would estop the Bank to deny it had a right of payment for the use of uncollected funds. *See Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1217 (6th Cir.), *cert. denied, Sunshine Biscuits, Inc. v. Apponi*, 484 U.S. 820, 108 S.Ct. 77, 98 L.Ed.2d 40 (1987) (elements of federal common law estoppel); *First Nat'l Bank of Rogersville v. Hawkins County*, 62 Tenn.App. 459, 463 S.W.2d 946, 950–51 (1970) (equitable estoppel by conduct "deeply ingrained" in law of Tennessee). The $500,000 line of credit was a conventional loan. By contract and by stipulation in this adversary proceeding, "ledger overdrafts" caused by Montgomery's use of uncollected funds in the Main Funding Account were covered by draws against this authorized loan until its exhaustion. That TNB immediately converted the use of uncollected funds in the Main Funding Account into conventional debt by draws against the line of credit demonstrates the Bank's perception and intent that the use of uncollected funds in the Main Funding Account rendered Montgomery the Bank's debtor. This debtor/creditor relationship continued after exhaustion of the line of credit—only the accounting technique changed. Instead of drawing against the line of credit, the Bank accounted for its right of payment from Montgomery by calculating average, negative collected balances and assessing "analysis charges" each month.

## B. CONTEMPORANEOUS EXCHANGE DEFENSE

In a variation on its antecedent debt argument, TNB asserts it "contemporaneously exchanged new value" by surrendering its right of dishonor of ZBA checks for deposits to the Main Funding Account.

As the Sixth Circuit explained, "two elements are crucial to the establishment of the contemporaneous exchange exception: (1) The parties must intend that the exchange be substantially contemporaneous; (2) the exchange must *in fact* be substantially contemporaneous." *Ray v. Security*

*Mutual Fin. Corp. (In re Arnett)*, 731 F.2d 358, 362 (6th Cir.1984). Intent alone is not sufficient—the exchange must *"in fact"* be contemporaneous in that there must be "temporal proximity between the [new value] and the [debtor's] transfer...." *Id.* at 364. "New value" can be in the form of a release of rights, but the § 547(c)(1) defense is available only where the value of the rights released is equivalent to the full amount of the transfer by the debtor. *See Lowrey v. U.P.G., Inc. (In re Robinson Bros. Drilling, Inc.)*, 877 F.2d 32, 33 (10th Cir.1989) *explaining Kenan v. Fort Worth Pipe Co. (In re Rodman)*, 792 F.2d 125 (10th Cir.1986) and *citing Jet Florida, Inc. v. American Airlines, Inc. (In re Jet Florida, Inc.)*, 861 F.2d 1555, 1559 (11th Cir.1988). The party asserting the § 547(c)(1) defense must prove the specific measure of the new value given to the debtor in "money or money's worth in goods, services, or new credit...." *Electronic Metal Prod., Inc. v. Bittman (In re Electronic Metal Prod., Inc.)*, 916 F.2d 1502, 1506 (10th Cir.1990); *Jet Florida*, 861 F.2d at 1559; *In re Robinson Bros. Drilling, Inc.*, 877 F.2d at 34. The new value must be value to the estate—in the absence of an enhancement of the estate, the defense fails. *Electronic Metal Prod.*, 916 F.2d at 1506.

TNB failed to prove the value of the surrender of its right to dishonor ZBA checks; the trustee demonstrated that if any such right was surrendered by TNB, it was valueless to the estate. More than 80% of the items presented on the ZBA account at TNB were kited checks written by Montgomery against nonexistent funds at TNB for deposit to Montgomery controlled accounts at other banks which were then used to kite checks for deposit back to the Main Funding Account at TNB. At any moment during the preference period had TNB dishonored checks presented against the ZBA account, the kite would have collapsed and multi-million dollar overdrafts would have manifested at the banks then involved in the kite. The amount of that overdraft which would have been resident at TNB would have depended upon the date of dishonor, the time of day

of dishonor, the speed at which other banks in the kite responded to the dishonor, etc. TNB has offered no evidence that the estate was enhanced "in money or money's worth" by the honoring of kited checks. If there was value, it was value to TNB. To work its way out of its "severe" deficit collected balances, TNB had to honor kited items presented on the ZBA in decreasing amounts until the use of uncollected funds in the Main Funding Account was reduced to zero. This is precisely what occurred as the Bank shut down the cash management system. The (unauthorized) outstanding debt of the debtors in the kite was not reduced as TNB withdrew from the kite; the debt simply shifted to other banks. After the kite at TNB was eliminated entirely (April 19–21), the total kite against all known Montgomery controlled accounts continued at approximately the same level as before, peaking again at $1,843,923 on April 27. Benefit to TNB cannot support the contemporaneous exchange defense.

The exchange relied upon by TNB for the § 547(c)(1) defense was not intended by the parties to be contemporaneous and was not in fact temporally proximate. It is disingenuous for TNB to argue that it "intended" a contemporaneous exchange of deposits to the Funding Account and the payment of items presented against the ZBA account. The purpose of the cash management system as explained by TNB was to speed up deposits to the Funding Account and delay disbursements from the ZBA account. It was the "days of float" thus gained that were to generate investment income for Montgomery. The Bank has not tied the payment of particular ZBA items to any particular unauthorized extension of credit caused by Montgomery's check kiting scheme. In this respect, TNB is a victim of the kite just as is Sovran Bank and others whose apparent ledger balances became "overdrafts" when the kite collapsed. The commingling of kited and not-kited incoming and outgoing items in the Main Funding Account and the ZBA account may render it mathematically impossible to trace the payment of any partic-

ular ZBA item to the unauthorized extension of debt caused by the kite.

The structure and operation of the cash management system demonstrate that no contemporaneous exchange of the sort argued by the Bank actually took place. Checks presented against the ZBA account were paid on the day after presentment without regard to whether there was any balance, collected or uncollected, in the Main Funding Account. At least six times during the preference period, the debit of the Main Funding Account exceeded even the uncollected balance in that account. TNB did not know whether there were funds in the Main Funding Account until a day or more after passage of the "midnight deadline" for payment of items presented against the ZBA account. Although the Bank argued it "could have" created a system to determine whether there were deposits in the Main Funding Account to "trade" for the payment of ZBA checks, the Bank did not at any time institute such a procedure or see any need to do so— "overdrafts" to the Main Funding Account were covered by the line of credit, and then by "analysis charges."

The ZBA account could not operate the way TNB argues. In this circuit, a transfer by check occurs for preference purposes at delivery. *Official Unsecured Creditors Comm. of Belknap, Inc. v. Shaler Corp. (In re Belknap, Inc.)*, 909 F.2d 879 (6th Cir.1990). The ZBA account did not zero out each day as represented, but functioned "one day in arrears." TNB had the burden to prove "temporal proximity ... *in fact.*" TNB cannot draw into "temporal proximity" the transfer of checks into the Main Funding Account and the "surrender" of the right to dishonor ZBA checks because there was always at least one full business day between delivery of a deposit and the "midnight deadline" for any ZBA check presented on the same day.

Deposits to the Main Funding Account were used for many purposes other than payment of ZBA checks. For example, TNB drafted the Main Funding Account each month to pay itself the "analysis charges" for the use of uncollected funds

in the Main Funding Account. In the days after TNB "deleted" the cash management system, the Main Funding Account was used to make a payment of $240,000 on the line of credit. To accomplish withdrawal of TNB from the kite, on April 18, 1988, Montgomery stopped writing checks against the ZBA for deposit to Montgomery controlled accounts at other banks, but deposits from other Montgomery controlled accounts into the Main Funding Account continued until the unauthorized loan floating in the kite was moved completely out of TNB and into other banks. The transfers to the Bank after April 18 by deposits to the Funding Account were not balanced by surrender of any rights by TNB; instead, TNB recouped from those last deposits the insecurity created at TNB by the kiting of checks that began months before.

## C. ORDINARY COURSE OF BUSINESS DEFENSE

11 U.S.C. § 547(c)(2) insulates from recovery transfers that are otherwise preferential under the following circumstances:

> (c) the trustee may not avoid under this section a transfer—
>
> . . . .
>
>> (2) to the extent that such transfer was—
>>
>>> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>>>
>>> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>>>
>>> (C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).

The Bankruptcy Code does not define "ordinary course of business" or "ordinary business terms;" the legislative history is "sparse." *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 872 F.2d 739, 743 (6th Cir.1989). The defense was intended to protect "recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the debtor and the transferee." *Fulghum Constr. Corp.*, 872 F.2d at 743 *quoting Energy*

*Coop., Inc. v. Socap Int'l, Ltd. (In re Energy Coop., Inc.)*, 832 F.2d 997, 1004 (7th Cir.1987). "[N]ormal financial relations" do not detract from the general policy of the preference section "to discourage unusual action by either the debtor or creditors during the debtor's slide into bankruptcy." *Grogan v. Liberty Nat'l Life Ins. Co. (In re Advanced Glove Mfg., Co.)*, 761 F.2d 249, 251 (6th Cir.1985) *quoting* H.R.REP. NO. 595, 95th Cong., 1st Sess. 373 (1977) *reprinted in*, 1978 U.S.CODE CONG. & ADMIN.NEWS 5787, 6329. Bankruptcy courts in this circuit have been instructed to engage in a "peculiarly factual analysis," focusing on the business practices of the particular parties under consideration. *In re Fulghum Constr. Corp.*, 872 F.2d at 743; *Gosch v. Burns (In re Finn)*, 909 F.2d 903, 907 (6th Cir.1990). Industry practices "might be relevant to the § 547(c)(2)(C) element of 'ordinary business terms.'" *Fulghum Constr. Corp.*, 872 F.2d at 743 n. 5.

One line of Sixth Circuit cases indicates that the ordinary course of business defense is not available where the conduct of the debtor's business is "totally unorthodox and illegal...." *First Fed. of Michigan v. Barrow*, 878 F.2d at 918. In *First Fed. of Michigan v. Barrow*, on summary judgment, the Sixth Circuit rejected the ordinary course of business defense where "the indebtedness incurred by the debtors, including the diversion and misappropriation of funds ... was not in accordance with ordinary business practices." *Id.* at 919. In *Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corp.)*, 888 F.2d 42 (6th Cir.1989), the district court based rejection of the § 547(c)(2) defense on the holding that the debtor had made payments that were illegal under ICC regulations. On appeal, the Sixth Circuit concluded that the debtor's payments were "not unauthorized or unlawful under the ICC regulating scheme, and as such [are] not per se outside of the ordinary course of business exception." *Id.* at 44.

■ Other Sixth Circuit cases have held that where the debtor's business transactions are only "irregular," they may be "ordinary" for § 547(c)(2) purposes if "consistent with the course of dealings between the particular parties." *Fulghum Constr. Corp.*, 872 F.2d at 743; *In re Finn*, 909 F.2d at 907. However, "irregular" transactions will fail ordinary course of business analysis if, during the preference periods, the debtor or the transferee changed the timing, the amount, the manner or the circumstances under which business was previously transacted. *Yurika Foods Corp.*, 888 F.2d at 45.

### 1. The Debtors' Illegal Check Kiting Scheme is Outside the § 547(c)(2) Defense

■ The debtors' conduct during the preference period renders the ordinary course of business defense unavailable under the "totally unorthodox and illegal" standard in *First Fed. of Michigan v. Barrow*, 878 F.2d 912 (6th Cir.1989) and *Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corp.)*, 888 F.2d 42 (6th Cir.1989).

Check kiting is unlawful. 18 U.S.C. § 1344; TENN.CODE ANN. § 39–14–121. The evidence of check kiting was uncontradicted by the Bank. Like the debtors in *First Fed. of Michigan v. Barrow*, these debtors misappropriated funds from TNB and others by fraud. As in *First Fed. of Michigan v. Barrow*, transfers that enabled TNB to escape the debtors' fraud during the preference period were made at the expense of similarly situated general creditors in these bankruptcies.

■ Transfers during the preference period in furtherance of a scheme to defraud are appropriately not protected by § 547(c)(2). Chief Judge Paine of this court, sitting by designation in the Eastern District of Tennessee, has held that "Ponzi-type schemes are not legitimate business enterprises and ... are not entitled to § 547(c)(2) protection." *DuVoisin v. Anderson (In re Southern Ind. Banking Corp.)*, 87 B.R. 524, 525 (Bankr.E.D.Tenn. 1988). A Ponzi scheme is "any sort of fraudulent arrangement that uses later acquired funds or products to pay off previous investors." *Danning v. Bozek (In re*

*Bullion Reserve of North America)*, 836 F.2d 1214, 1219 n. 8 (9th Cir.), *cert. denied, Bozek v. Danning*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988). Check kiting is a form of Ponzi scheme. In the typical Ponzi scheme, each layer of (fraudulently induced) loans or investment is used to pay off the previous layer; in a check kite, the kiter serially creates unauthorized loans to cover unauthorized loans that are earlier in time in the stream of kited checks. In a Ponzi scheme, early victims are repaid with later victims' money and the last investor(s) is left with an uncollectible, unsecured loan; in a check kite, early victims are paid with unauthorized loans from later victims and the last bank(s) out ends up with the unauthorized "overdraft" that was floating in the kite. Many courts, including the Courts of Appeals for the Fifth and Ninth Circuits, have concluded that Congress did not intend the ordinary course of business exception to protect a fraudulent Ponzi scheme and that the defense is not available to protect one victim of a debtor's fraud at the expense of others. *See Graulty v. Brooks (In re Bishop, Baldwin, Rewald, Dillingham & Wong)*, 819 F.2d 214, 217 (9th Cir.1987); *In re Bullion Reserve of North America*, 836 F.2d at 1219; *Wider v. Wootton*, 907 F.2d 570, 572 (5th Cir.1990); *Henderson v. Allred (In re Western World Funding, Inc.)*, 54 B.R. 470, 481 (Bankr.D.Nev.1985); *Rafoth v. Bailey (In re Baker & Getty Fin. Serv., Inc.)*, 88 B.R. 792, 799 (Bankr.N.D.Ohio 1988). *But see Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 874–75 (D.Utah 1987).

Applying the ordinary course of business defense to enable TNB to withdraw from this check kiting scheme during the preference period would violate the "dual purpose" of § 547—"to discourage creditors from racing to the courthouse to dismember the debtor during its slide into bankruptcy and to further the prime bankruptcy policy of equal distribution among similarly situated creditors." *Bullion Reserve of North America*, 836 F.2d at 1217. TNB did not continue doing business with the debtors during the "slide" into bankruptcy. Exactly the opposite occurred: TNB pushed the debtors out of the Bank, recouping its insecurity in the process by eliminating uncollected balances and escaping the debtors' kite. Other victims of the debtors' check kite are similarly situated to TNB but unpaid. "Equality of distribution" is defeated if TNB is withdrawn from the kite during the preference period by shifting the kite to other banks. The United States Court of Appeals for the Ninth Circuit recognized this in *Graulty v. Brooks (In re Bishop, Baldwin, Rewald, Dillingham & Wong)*, 819 F.2d 214, 217 (9th Cir.1987):

> We agree with bankruptcy courts that have addressed the issue that Ponzi schemes simply are not legitimate business enterprises which Congress intended to protect with section 547(c)(2):
>
>> 'To apply [§ 547(c)(2) ] to immunize these activities "would lend judicial support to 'Ponzi' schemes by rewarding early investors at the expense of later victims." (cite omitted) … These defendants received the funds from investments made on the eve of bankruptcy, by persons who recovered nothing. Equity requires that these creditors all share equally in whatever assets are available.'

*2. The Debtors and the Bank Abandoned Any Ordinary Course of Business During the Preference Period*

■ If it is possible to have an ordinary course of business between a bank and a check kiter, TNB had the burden to prove that the parties held to that ordinary course through the preference period. *First Fed. of Michigan v. Barrow*, 878 F.2d at 918–919. *See Advance Glove Mfg. Co.*, 761 F.2d at 252; *Yurika Foods Corp.*, 888 F.2d at 45. If the bankruptcy court receives evidence of "unusual collection efforts, it must consider whether the debtor's payment was in fact a response to those efforts." *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566 (11th Cir.1986). *See Yurika Foods Corp.*, 888 F.2d at 45. "Ordinary" includes whether the debtors' transactions with TNB deviated from industry norms or common indus-

try practice and whether transactions between the debtors and TNB were consistent during the preference period. *Yurika Foods Corp.*, 888 F.2d at 45; *Production Steel, Inc. v. Sumitomo Corp. of America (In re Production Steel, Inc.)*, 54 B.R. 417, 423 (Bankr.M.D.Tenn.1985); *In re Magic Circle Energy Corp.*, 64 B.R. 269, 272 (Bankr.W.D.Okla.1986).

TNB did not attempt to prove that check kiting is "ordinary" in the real estate closing business. TNB also failed to align the debtors' use of the cash management system with any industry practices. The Bank's officers admitted they were not aware of any other cash management system in use by a real estate closing business. There may be good legal and ethical reasons why attorneys who conduct real estate closings do not use cash consolidation systems like that proposed by TNB. *See* Tenn.S.Ct. Rule 8, D.R. 9–102(C)(1). If there is a real estate closing industry that uses cash management systems, TNB failed to demonstrate that "severe uncollected balances" and monthly analysis charges of $30,000 are ordinary within that business.

TNB engaged in unusual collection activity during the preference period. TNB knew in January of 1988 it had a problem with the debtors. Although no one at the Bank admits making mental connections between the earlier check kiting in Montgomery's Southland Properties account and Montgomery's "unusual" use of the cash management accounts, the Bank knew that Montgomery was "into problems" with "severe" deficit collected balances and unprecedented analysis charges. In February, the Bank pressured Montgomery to solve these problems. On April 7, 1988, within the preference period, TNB put an end to its prior course of dealings with the debtors by deleting the cash management system. The Bank instructed Montgomery to stop using the accounts. The Bank intended to eliminate the debtors as customers and to resolve the debtors' severe deficit collected balances. Changes in the pattern of use of a deposit account are indicative of a departure from the ordinary course of business, especially where the changes are

a "cloak for repayment." *Katz v. First Nat'l Bank of Glen Head*, 568 F.2d 964 (2d Cir.1977), *cert. denied, First Nat'l Bank of Glen Head v. Katz*, 434 U.S. 1069, 98 S.Ct. 1250, 55 L.Ed.2d 771 (1978). Deletion of the cash management system functioned as a cloak for repayment of TNB in two ways—the use of severe deficit collected balances in the Main Funding Account was eliminated and Montgomery was forced to move the kite to other banks to pay off the unauthorized debt at TNB.

The debtors' course of business changed dramatically in response to deletion of the cash management system at TNB. Between April 19 and April 21, Montgomery stopped kiting checks at TNB. After April 19, Montgomery manipulated accounts at other banks to build up the Main Funding Account to withdraw TNB from the kite and to eliminate uncollected balances at TNB. *See Omaha Nat'l Bank v. T & T Parts Warehouse, Inc.*, 39 B.R. 399 (Bankr. W.D.Mich.1984) (ordinary course of business defense not available where bank worked its way out of a check kite by allowing the build up of funds). The debtors' changes in business practices gave TNB an advantage over other similarly situated creditors by permitting TNB to withdraw from the kite. *Courtney v. Octopi, Inc. (In re Colonial Discount Corp.)*, 807 F.2d 594 (7th Cir.1986), *cert. denied, Octopi, Inc. v. Courtney*, 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 526 (1987) (cited with approval in *First Fed. of Michigan v. Barrow*, 878 F.2d at 918, "the obvious 'extraordinary' transaction is one designed to give the transferee an advantage over other creditors in bankruptcy."). During this process of working TNB out of the kite, Montgomery bounced checks totalling $320,000 and covered with cashier's checks—the first mention of cashier's checks in the relationship between the debtors and TNB. After the kite shifted to other banks, Montgomery made payments totalling $242,517 on the term loan—the first since creation of the line of credit in August of 1987. These unusual actions by TNB and by the debtors during the preference period enabled TNB to "win" the race

to the courthouse. *Waldschmidt v. Mid-State Homes, Inc. (In re Pitman)*, 843 F.2d 235, 237 (6th Cir.1988).

### III.

TNB improved its position during the preference period from its point of greatest insecurity on March 21 of $2,012,418 by transfers that preferred the Bank over other victims of the debtors' check kiting scheme.

In addition, during the preference period, after deletion of the cash management system and after the kite was shifted to other banks, transfers were made to TNB totalling $242,517 in payment of principal on the line of credit (converted to a term loan). Although it was alleged by TNB that this line of credit was secured, no evidence of security was offered to rebut the trustee's proof that this $242,517 was more than TNB would have received in a liquidation under Chapter 7. Avoidable transfers to TNB during the preference period totalled $2,254,935.

The trustee is entitled to prejudgment interest from the date of demand, January 30, 1989. *Southern Ind. Banking Corp.*, 87 B.R. 518.

An appropriate order will be entered.

### ORDER

For the reasons stated in the memorandum contemporaneously filed herewith, IT IS ORDERED, ADJUDGED and DECREED that the trustee recover from the defendant $2,254,935 plus pre-judgment interest from January 30, 1989.

IT IS SO ORDERED.